779 A.2d 1092 (2001)
Robert L. LOCKLEY, Jr., Plaintiff-Respondent,
v.
Ronda TURNER, Defendant-Appellant, and
State of New Jersey, Department of Corrections, Police Benevolent Association Local 105, Commissioner William H. Fauver and Jacqueline Jones, Defendants.
Robert L. Lockley, Jr., Plaintiff-Respondent,
v.
State of New Jersey, Department of Corrections, Defendant-Appellant, and
Police Benevolent Association Local 105, Commissioner William H. Fauver, Ronda Turner and Jacqueline Jones, Defendants.
Superior Court of New Jersey, Appellate Division.
Argued May 7, 2001.
Decided August 10, 2001.
*1095 Howard M. Nirenberg argued the cause for appellant Ronda Turner in A-1783-99T1 (Nirenberg & Varano, attorneys; Mr. Nirenberg and Sandra N. Varano, on the brief).
Allison E. Accurso, Assistant Attorney General, argued the cause for appellant State of New Jersey, Department of Corrections in A-1835-99T1 (John J. Farmer, Jr., Attorney General, attorney; Ms. Accurso and Nancy Kaplen, Assistant Attorney General, of counsel; Robert Garrenger, Deputy Attorney General, on the brief).
Linda Wong, Princeton, argued the cause for respondent Robert L. Lockley, Jr. in A-1783-99T1 and A-1835-99T1 (Wong Fleming, attorneys; Ms. Wong and Daniel C. Fleming, of counsel; Ms. Wong, Mr. Fleming and James K. Haney on the brief).
Before Judges WEFING, CUFF and LISA. *1093
*1094 The opinion of the court was delivered by WEFING, J.A.D.
These two appeals arise out of the same factual background and were argued together before us. We consolidate them for purposes of this opinion.
In A-1835-99, the State of New Jersey appeals from a judgment entered against it in favor of plaintiff Robert Lockley, Jr. and his attorneys in the total amount of $4.6 million. The judgment represents a jury verdict in favor of Lockley awarding him compensatory damages of $750,000 and punitive damages of $3,000,000 as well as the trial judge's post-verdict award of counsel fees of $855,350.19. After carefully reviewing the record and considering the arguments advanced on appeal, we affirm the award of compensatory damages and counsel fees but reverse the award of punitive damages and remand that aspect for further proceedings.
In A-1783-99, defendant Ronda Turner appeals from a post-judgment order entered by the trial judge. We dismiss that appeal as moot.
The State's arguments in A-1835-99 do not challenge the underlying determination of liability for compensatory damages. It asserts the amount awarded as compensatory damages was excessive, that there *1096 was error in submitting the question of punitive damages to the jury, and that the amounts awarded as punitive damages and as counsel fees were excessive. It is necessary, nonetheless, to set forth the underlying factual background in some detail for it is only in that manner that the arguments on the propriety of the awards can be properly analyzed.
Lockley is employed by the Department of Corrections of the State of New Jersey (Department) as a Senior Corrections Officer; his entire service has been spent at Mid-State Correctional Facility (Mid-State), located on the grounds of Fort Dix in Wrightstown, New Jersey. All of the inmates incarcerated at Mid-State are male, as are the vast majority of the corrections officers assigned there.
These lawsuits and subsequent appeals arise from the relationship which existed among Lockley and several of those few female corrections officers, specifically, Ronda Turner, Jacqueline Jones and their friend Linda Pyner-Bailey. There was, at trial, a sharp factual dispute between the parties about what occurred. It is clear from the jury's verdict that it accepted Lockley's version and rejected the State's. We thus set forth his version of what led to this suit.
Lockley and Turner worked on the same shift at Mid State but in different capacities. Lockley was assigned as a guard in one of the prison's perimeter towers. Turner held the designation "SA," for "special assignment", indicating she could be assigned where needed. She was principally assigned to assist in the prison's central command station, known as Center Control.
Lockley testified that his first contacts with Turner were in 1988 and were brief. The two would meet when he would come in to pick up his paycheck. According to Lockley, Turner would flirt with him. There is no indication that Lockley found the remarks offensive at the outset. At least three and possibly four years passed before he switched to direct deposit, thus obviating these encounters.
In any event, Turner became more assertive in her approach to Lockley. Lockley said that beginning in 1990, Turner began to express directly an interest in having a sexual relationship with him. Lockley told her that he was happily married, with children, and was not interested in pursuing such a liaison. Turner, however, persisted in her efforts to attract Lockley. Turner was not the least hesitant to express her interest in Lockley both to him and to other corrections officers, with the result that a large number of the staff at Mid State knew that Turner was actively pursuing him.
When she was unsuccessful, Turner, evidently feeling publicly humiliated by the rejection, eventually turned against Lockley. She began a campaign, in which she enlisted her friends, to insult Lockley publicly about his sexuality. We will not set forth in this opinion the actual language she and her friends employed; suffice it to say she expressed, in the most obscene and vulgar terms, persistent opinions about his alleged sexual preferences or lack thereof, alleged sexual abilities or lack thereof, and physical endowments.
She also, according to Lockley, subjected him to continuing petty indignities. One of her tasks in Center Control, for instance, was to operate the gates controlling entry to and exit from the prison. Lockley testified that Turner constantly made him wait before opening the gates for him and, on one occasion, almost closed the gate on him as he was passing through.
Lockley said that when he eventually complained to his superiors about Turner's conduct, he received no assistance or aid; indeed, he said, several could not understand *1097 why he simply did not accede to Turner's advances and sleep with her. He finally filed a formal complaint alleging sexual harassment.
Susie Belmont, who worked with the Department's equal opportunity/affirmative action office, was assigned the task of investigating Lockley's complaints; she concluded there was probable cause to believe Lockley had been subjected to sexual harassment. She prepared a probable cause letter which was presented to and signed by William H. Fauver, then Commissioner of the Department.
The letter which Belmont prepared and Fauver signed stated that the matter should immediately proceed to consideration of the appropriate discipline for Turner. This approach caused consternation among certain of the Department's personnel who believed that under State personnel procedures and union contracts Turner was entitled to a hearing on the merits of the charge before discipline could be imposed upon her.
There was some consideration of what steps were appropriate to take in the interim. Robert Barker, the Superintendent of Mid-State, recognized the importance of separating Turner and Lockley. Although Barker was not in favor of transferring Lockley, believing that to do so would make him a victim a second time, Lockley was offered the opportunity to transfer to another facility; he rejected it. Commissioner Fauver was of the view that Turner could not be transferred against her will to another facility in light of the Department's labor agreements with the union.
Eventually Turner was involuntarily placed on a different shift. Turner remained on that shift for several months. Later, a position opened up on the first shift and Turner applied for it. She wanted to return to the first shift because that schedule made it easier for her to care for her disabled son. Barker refused to award the post to Turner because doing so would reunite her with Lockley. Turner was entitled, however, in view of her seniority, to receive that assignment under the union contract, and she submitted a grievance. She ultimately prevailed on that grievance. When she returned, her friends at work held a small party at the prison to celebrate. No attempt was made to conceal that celebration from Lockley.
A disciplinary hearing was scheduled but was adjourned a number of times with the result that it did not take place until more than six months had elapsed after the probable cause letter was issued. Captain Powell Johnson, who was the administrative captain at Mid-State, was ultimately assigned the responsibility to represent management at this disciplinary hearing. Johnson testified that he was instructed by his superiors to do no more at this hearing in support of the charges against Turner than to present the probable cause letter. Others, however, testified that Johnson was instructed to prosecute the matter fully and present live witnesses. In any event, when the hearing finally did take place, Johnson did nothing to present the management case for discipline beyond introducing the probable cause letter, with the result that the hearing officer dismissed all charges against Turner; the State was precluded from reinstituting the same charges against her. Some of Turner's co-workers and friends brought a cake and flowers to the prison to celebrate the dismissal. Johnson was himself brought up on disciplinary charges for the manner in which he handled the hearing and received a ten-day suspension.
In 1994, Lockley filed a seven-count complaint alleging various causes of action. The matter was tried and submitted to the jury on the theory of sexual harassment and retaliation in violation of the Law *1098 Against Discrimination (LAD), N.J.S.A. 10:5-1 to -42.
At trial, Lockley contended that the dismissal of the charges against Turner was but one more indication of the Department's failure to take his complaints of sexual harassment seriously. The State contended, on the other hand, that it had attempted to fully discipline Turner for her actions but that its efforts had been subverted by Johnson's insubordination and by labor agreements.

I
We turn first to the State's challenge to the jurors' award of compensatory damages of $750,000. The State contends that the amount is grossly excessive and not supported by the record. It notes, for instance, that the trial judge struck Lockley's claim for damages based upon an allegation that Turner's confederate, Jones, worked to deprive him of overtime he would otherwise have received. Thus, no claim for economic loss was presented to the jury. In addition, it stresses that despite Lockley's claims of harassment and hostile work environment, he did not suffer any adverse employment consequences and, in fact, received higher performance ratings. The State also stresses that Lockley never sought any form of professional counseling or treatment for the stress he said he suffered at work, stress which he said led to his emotional withdrawal from his family. During the course of the trial he presented no expert testimony in support of his claim of emotional distress and, in consequence, the jury was not allowed to include any future emotional suffering and distress as a component of its award. The jury was instructed that if it awarded damages to Lockley for his emotional distress, it should only be for the distress he experienced from the time the harassment commenced through the time of trial. All of these factors, according to the State, support its contention that the award of $750,000 is grossly excessive.
We are not persuaded by the State's argument in this regard. We note first the appropriate standard of our review of a judgment entered following a jury verdict and denial of a post-trial motion for new trial or remittitur. The Supreme Court has consistently held that verdicts should be overturned as excessive only in "clear cases." Caldwell v. Haynes, 136 N.J. 422, 431-32, 643 A.2d 564 (1994). When such a motion is presented to the trial judge, the judge "must consider the evidence in the light most favorable to the prevailing party in the verdict." Id. at 432, 643 A.2d 564. "[T]he jury's evaluation should be regarded as final" if its verdict has "reasonable support in the record." Baxter v. Fairmont Food Co., 74 N.J. 588, 599, 379 A.2d 225 (1977) (quoting Taweel v. Starn's Shoprite Supermarket, 58 N.J. 227, 236, 276 A.2d 861 (1971)). Thus, a jury's verdict
should not be overthrown except upon the basis of a carefully reasoned and factually supported (and articulated) determination, after canvassing the record and weighing the evidence, that the continued viability of the judgment would constitute a manifest denial of justice.

[Baxter, supra, 74 N.J. at 597-98, 379 A.2d 225.]
The trial judge who is presented with such a motion may not act as "a thirteenth and decisive juror" but rather must evaluate the evidence using a "high degree of conscientious effort and diligent scrutiny." Id. at 598, 379 A.2d 225 (quoting Dolson v. Anastasia, 55 N.J. 2, 6, 258 A.2d 706 (1969)). "The object is to correct clear error or mistake by the jury. It is only upon the predicate of a determination that there has been a manifest miscarriage of justice, that corrective judicial action is warranted." Baxter, supra, 74 N.J. at 598, *1099 379 A.2d 225. This approach "applies with equal force to awards of emotional distress damages in LAD cases." Rendine v. Pantzer, 141 N.J. 292, 312, 661 A.2d 1202 (1995).
Our review is similar. We may not reverse a trial judge's denial of a motion for a new trial "unless it clearly appears that there was a miscarriage of justice under the law." R. 2:10-1.
Accordingly, "[t]he standard for appellate review of a trial court's decision on a motion for a new trial is substantially the same as that controlling the trial court except that due deference should be made to its `feel of the case,' including credibility." At the same time, a trial court's determination is "not entitled to any special deference where it rests upon a determination as to worth, plausibility, consistency or other tangible considerations apparent from the face of the record with respect to which he is no more peculiarly situated to decide than the appellate court."

[Caldwell, supra, 136 N.J. at 432, 643 A.2d 564 (citations omitted).]
Here, the trial judge acted in compliance with the Supreme Court's admonition that in deciding a motion for a new trial, the judge should "spell out fully the reasons for [its] determinations so that reviewing tribunals may be advised of the extent to which factors entitled to deference entered into the decision." Baxter, supra, 74 N.J. at 600, 379 A.2d 225. The trial judge stated that he considered the award to be high but concluded that it could not be considered "shocking." He noted that "[p]laintiff and his wife were excellent credible witnesses on the effect of sexual harassment on their marriage and family life, and the emotional distress that the marital tensions caused the plaintiff." The trial judge estimated that if the jury selected the time of Turner's initial aggressive advances in 1990 as the appropriate date from which to calculate damages, the award amounted to approximately $225 per day.
We reject the State's attempt to parse this award into narrow categories. It noted, for instance, that Lockley's work as a tower guard separated him physically from Turner for seven and one-half hours a day. That physical separation did not, however, obviate all contact between them, as Lockley graphically testified. The State also stressed that because of their differing work schedules, Lockley and Turner were only together at Mid-State for three to four days of the week. Emotional turmoil, however, cannot be so neatly categorized; it is not turned on and off like a spigot. The argument, moreover, overlooks the fact that Turner did not act alone; her friends relentlessly joined in Turner's assaults and there is no reason to conclude that they reached out to Lockley in friendship on the days when Turner was not present. Even if they did not continue to harass Lockley if Turner were not present to inspire and goad them, certainly their own physical presence would serve to remind Lockley of what had occurred and what was likely to resume when Turner returned.
We decline to attribute any significance, for purposes of assessing the jury's award, to Lockley not seeking professional help to cope with his emotional distress and suffering. In Rendine, supra, 141 N.J. at 312, 661 A.2d 1202, the Supreme Court specifically agreed with this court's earlier determination that expert testimony is not a prerequisite to an award for pain and suffering in a LAD case.
In reviewing this verdict, we must accept, as we noted earlier, the factual version most favorable to plaintiff. Under that scenario, Lockley was subjected for an extended period of years, to a relentless assault on his dignity and inherent sense *1100 of self; his superiors provided no assistance or relief. Where he had previously enjoyed his work, he experienced a daily sense of dread which required he prepare himself, psychologically and emotionally, to return each day to work, certain only that the assaults would continue unabated. We concur with the trial judge's assessment that the lawsuit did not merely revolve around exposure to obscene and vulgar language. The attacks upon Lockley's dignity are not of lesser import because obscenities were commonly heard in the prison environment. We see no basis to conclude that this award is so excessive that it represents a "manifest denial of justice." R. 2:10-1. In our judgment, the Court's recent opinion, Fertile v. St. Michael's Medical Center, 169 N.J. 401, 779 A.2d 1078 (2001) only provides further support for this conclusion.

II
We turn now to the jury's award of punitive damages in the amount of $3,000,000. We have concluded, after careful analysis and consideration, that this verdict cannot stand; we are compelled to reverse and remand. We reach this conclusion with particular reluctance; we are aware that the trial judge who presided over this matter has unfortunately passed away. On remand, the matter will, of necessity, be handled by a judge unfamiliar with the original trial of the matter. Although this may complicate matters and represent a burden on whichever judge is responsible for the remand, we see no option. If in our considered judgment, the punitive damages award is fatally flawed for several reasons, it does not serve justice to keep the award in place because of the untimely death of the original trial judge.
Several procedural and substantive aspects of the trial which culminated in this award lead to our conclusion. We deal first with the procedural.

A
The trial of this hotly-contested matter spanned three weeks; the trial commenced on May 11, 1999 and concluded on May 28, 1999, the Friday marking the commencement of the Memorial Day holiday weekend. The trial judge instructed the jury in the late afternoon of May 26, 1999; according to the transcript, the judge did not even commence his instructions until after 4:00 p.m. Not surprisingly, the jury elected, after the instructions concluded, not to deliberate that day but to return the following day. It did so and deliberated all day on May 27 without reaching a verdict. The jury returned on Friday, May 28, and resumed its deliberations. Shortly before 10:30 a.m., the jury returned its verdict. The verdict sheet prepared by the trial judge contained seven questions; the jury answered all unanimously. It found that plaintiff had proved sexual harassment in violation of LAD, that there had been unlawful retaliation in violation of LAD, that the Department should be held responsible for the sexual harassment and the unlawful retaliation, that the individual defendant William H. Fauver did not aid and abet the unlawful sexual harassment and retaliation, that plaintiff's compensatory damages were $750,000 and that plaintiff was entitled to punitive damages.
The judge held a brief sidebar with counsel to discuss how to proceed, then instructed the jury to take a recess of about fifteen minutes and to return for summations and further instructions on the question of punitive damages. When court resumed, the two deputy attorneys general representing the State at trial requested that the matter be held until 1:30 p.m. to permit an assistant attorney general to arrive to argue the issue of how the *1101 question of punitive damages should be presented to the jury. Plaintiffs vigorously objected to the request, arguing that the State should have been prepared to proceed immediately on the question of punitive damages. After a brief argument, during which the trial judge noted that the State was asking for no more than one hour, the trial judge acceded to plaintiff's demands that the matter proceed immediately, denied the State's request to hold the matter until after the luncheon recess, and directed the matter to proceed immediately to the presentation of evidence, summation and charge.
We hesitate, from a distance, to second-guess the manner in which a trial judge handles such questions of scheduling but we are convinced that the State's request for a brief adjournment was reasonable and should have been granted. Plaintiffs argued to the trial judge and repeat to us that the question of how to handle the issue of punitive damages had been discussed on the record as early as May 11 and thus the State should have been prepared to proceed as soon as the jury determined on May 28 that punitive damages were warranted.
At the close of the proceedings on May 11, the trial judge and counsel engaged in a discussion of certain evidence questions relating to Lockley's claim of lost overtime opportunities. At the conclusion of that discussion, they turned briefly to the question of what should be presented to the jury in the event the jury decided punitive damages were in order. There was not even an attempt to resolve that question, the court stating "we need to think about it." The issue did not come up again on the record until May 28 when the State made its request for a brief recess and the trial judge denied it.
We cannot consider untoward the State's request for one hour of time to permit an assistant attorney general to arrive from Trenton and argue, particularly under the circumstances of this case. Nor are we able to perceive any valid reason for plaintiff's counsel to have so vigorously opposed the request. From our review of this record, we do not discern any evidence that the State was at that point engaged in "stonewalling," a litigation stance on the question of punitive damages we have not hesitated to criticize in appropriate contexts. Baker v. National State Bank, 312 N.J.Super. 268, 294, 711 A.2d 917 (App.Div.1998), aff'd, 161 N.J. 220, 736 A.2d 462 (1999). We do not perceive, as plaintiff's counsel suggested below, that the State was seeking special treatment; we would hope that any litigant would be afforded a brief opportunity before plunging headlong into a question of this complexity and significance. As we develop more fully in a later section of this opinion, the issue of computing punitive damages against a public entity is fraught with complications, none of which, in our judgment, was adequately addressed.
We recognize that the trial judge may have felt a particular necessity to conclude this trial. We have discovered from our review of the transcript that the trial judge learned during the trial that he was being reassigned to another division, effective on the day after Memorial Day. His presence was required in that other division, which was short-handed due to illness. It is entirely understandable that the trial judge, in such a situation, would feel a particular necessity to bring this matter to a close so as not to interfere with his ability to begin his new assignment immediately.
Our mention of this is in no way intended as a veiled criticism of the trial judge; indeed we are acutely sympathetic to the situation in which he found himself. We are, however, left with the firm sense that, for whatever reason, the question of the *1102 best method of handling the issue of punitive damages did not receive the full analysis and consideration it required.
In addition, we are compelled to note that plaintiff's complaints that the State was not ready to proceed seem somewhat analogous to trying to force the wrong foot into a too-tight shoe. Plaintiff, seeking punitive damages, had the burden of proof on the question of defendant's financial condition, Gares v. Willingboro Tp., 90 F.3d 720, 730 (3rd Cir.1996), not the State. During the initial discussion on how to proceed after the jury's initial verdict, plaintiff said he would read into the record an interrogatory answer dealing with the financial condition of the Department. Plaintiff failed to do so, however, with the result that this jury made its decision on the amount of punitive damages in a complete vacuum.

B
More fundamentally, however, we consider two aspects of the trial court's instructions to the jury on punitive damages to be fatally flawed. The trial judge divided the question of punitive damages; he instructed the jury in his initial charge on the law governing punitive damages and asked the jury whether punitive damages were warranted in this matter. After the jury answered that question (as well as the questions relating to compensatory damages) in the affirmative, the judge then instructed the jury on the law governing the determination of a proper quantum of punitive damages. The State did not object at trial to this procedure and does not challenge it on appeal. We have concluded that error occurred in both aspects of the judge's instructions, however.
One of the recurrent themes put forth by the State in its defense was that if Turner's assaults occurred, they represented actions of lower level employees. The State argued that the Department's higher level staff attempted to deal with the situation in which Lockley found himself but that their efforts were hampered both by labor contracts and the rogue actions of Johnson. Lockley, on the other hand, argued that the Department made no meaningful effort to provide relief to him; he argued the Department dragged out its investigation, stalled the hearing, acted to subvert the conduct of the hearing and thwarted any effort to assign Turner to another facility.
It was critically important, in terms of the Department's potential liability for punitive damages, to identify the roles of particular staff members and their resultant conduct for while the Supreme Court concluded in Cavuoti v. New Jersey Transit Corp., 161 N.J. 107, 132-33, 735 A.2d 548 (1999) that a public entity may be subject to punitive damages under LAD, it adhered to its earlier determination in Lehmann v. Toys `R' Us, Inc., 132 N.J. 587, 626 A.2d 445 (1993) that punitive damages for employment discrimination are only appropriate if there is proof not only that the offending conduct is especially egregious but also proof of "actual participation in or willful indifference to the wrongful conduct on the part of upper management." Cavuoti, supra, 161 N.J. at 113, 735 A.2d 548 (quoting Rendine, supra, 141 N.J. at 314, 661 A.2d 1202).
There were discussions at various points during the trial between the trial judge and counsel on how to present the question to the jury whether "upper management" had been involved in the harassment and retaliation. Eventually, the court determined to pose the simple question whether upper management had been involved, without any attempt to explain and expound upon the term "upper management". We recognize that this was done with the agreement of counsel and before the trial judge had the benefit of the *1103 Court's opinion in Cavuoti, supra, 161 N.J. at 121-131, 735 A.2d 548, which contains an extensive discussion of the analysis which is necessary to determine whether upper management has been involved in the unlawful discrimination. This happenstance of timing does not, in our judgment, justify an affirmance.
Within its opinion, the Cavuoti Court noted that the task of identifying whether an offending actor may be considered a member of upper management for purposes of awarding punitive damages is "fact-sensitive" and should be guided by three public policy considerations:
(1) the purposes of the LAD; (2) the purposes of punitive damages; and (3) the demands of justice for a broadly-based definition that will be applicable to different employment structures.

[Id. at 122, 623 A.2d 234.]
The Court noted that upper management is not confined to those individuals occupying the top-most tier in an organizational chart but includes those individuals who have "significant power, discretion and influence within their own departments." Id. at 123, 623 A.2d 234 (quoting New Jersey Tpke Auth. v. American Fed'n of State, County and Mun'l Employees, Council 73, 150 N.J. 331, 356, 696 A.2d 585 (1997)). It continued that assigning an individual to the ranks of upper management involves a sensitive analysis of the tasks performed by that person, not mere reliance upon the job title carried. Cavuoti, supra, 161 N.J. at 123-24, 735 A.2d 548. After analyzing definitions adopted in other cases, the Court discerned "a common premise-that the culpable employees have sufficient authority so that the imputation of damages against the employer is fair and reasonable." Id. at 126, 735 A.2d 548. The Court concluded its discussion in the following terms:
For these purposes, it is fair and reasonable to conclude that upper management would consist of those responsible to formulate the organization's anti-discrimination policies, provide compliance programs and insist on performance (its governing body, its executive officers), and those to whom the organization has delegated the responsibility to execute its policies in the workplace, who set the atmosphere or control the day-to-day operations of the unit (such as heads of departments, regional managers, or compliance officers). For an employee on the second tier of management to be considered a member of "upper management," the employee should have either (1) broad supervisory powers over the involved employees, including the power to hire, fire, promote, and discipline, or (2) the delegated responsibility to execute the employer's policies to ensure a safe, productive and discrimination-free workplace. Obviously such instructions should be tailored to the facts of the case and might be accompanied by special interrogatories when several officers are presented as members of "upper management."

[Id. at 128-29, 735 A.2d 548.]
None of these factors, however, was presented to the jury to guide its deliberations in answering the question whether punitive damages were warranted in this situation. If, in the course of its deliberations, the jury had concluded that Commissioner Fauver bore responsibility, we would decline to overturn the verdict even in the absence of appropriate guidelines in the instructions. There could be no doubt that as Commissioner, he would be considered "upper management." The jury, however, absolved him of all individual responsibility and it is impossible to know from the record which person or persons the jury deemed to be upper management.
We consider that determination to be particularly significant in the present context. *1104 During the presentation of his case, plaintiff presented the testimony of eighteen present or former employees of the Department, ranging from Commissioner Fauver down to corrections officers. Their responsibilities naturally varied widely, as did their responses to Lockley's complaints. Robert Barker, for instance, who was Superintendent of Mid-State at the time, testified that he met with Assistant Commissioner Beyer after the probable cause letter was issued and urged that Turner be transferred from Mid-State to separate her from Lockley. Beyer testified that under the organizational structure of the Department, he lacked the authority to order such an involuntary transfer and that it was subject to the review of the Commissioner. Beyer further testified that shortly after his meeting with Barker, he was informed that Turner could not be transferred to another facility against her will. And, as we noted, the jury determined that Fauver did not bear any individual responsibility.
There was, moreover, consistent testimony that the Department was organized in a structured hierarchy, with some witnesses describing it as "paramilitary." In such a structure, it is all the more important to identify those individuals who abused whatever trust and discretion had been vested in them to make a fair and balanced decision whether they indeed can accurately be characterized as occupying upper management. The Court of Appeals, for example, has recognized that a police captain in charge of plaintiff's shift did not necessarily qualify as upper management for purposes of LAD. Hurley v. Atlantic City Police Dep't, 174 F.3d 95, 124-25 (3d Cir.1999), cert. den., 528 U.S. 1074, 120 S.Ct. 786, 145 L.Ed.2d 663 (2000).
We noted earlier in our discussion of this topic that the Court's opinion in Cavuoti, supra, was not released until several months after return of the jury's verdict and thus was not available when the trial judge was formulating his instructions. Even he, however, in deciding defendant's post-trial motion for a new trial, referred to the omission as "troubling" and said that "some other Court's going to have to second guess that" decision. Although he expressed the view that the term was "not so esoteric that laypersons could not understand it without further definition," we consider the very length of the Supreme Court's analysis in Cavuoti to indicate clearly the subtleties and distinctions that must be drawn to reach a fair and balanced conclusion. None of those subtleties and distinctions, however, was brought to the fore to aid the jury in reaching its decision.

C
We turn now to the second substantive error we perceive on the topic of punitive damages. After the jury decided that punitive damages were warranted and the trial judge denied the State's request for a brief adjournment, he instructed the jury on computing an award of punitive damages and counsel summed up. The judge's instructions were brief and succinct. He dealt with the role of the State as the defendant in interest in the following manner.
With respect to the ability of the Defendant State of New Jersey to pay punitive damages, I will tell you this. The State of New Jersey as a governmental entity has the ability, theoretically, to pay any award, any amount of punitive damages that you might award. Money that the State of New Jersey obtains is obtained by using its power of taxation, by fees for user fees, et cetera. Of course, there's a budget that, of course, not only raises money, it expends money and sometimes if it expends less than it raises, it runs a surplus. Sometimes if it *1105 spends more in any given fiscal year than it has raised, it runs a deficit. So that's in broad terms how the State functions.
Any monies that the State is required to expend for whatever purpose it may be, may or may not affect taxes. Pure speculation as to whether any amount of money that the State has to pay would affect taxes, and you [may] not in your consideration of punitive damages focus at all as to how the amount of your award might affect taxes or anything of that nature. You should determine the punitive damages based solely on the criteria that I have given you without focusing on how this is going to affect the tax rate or anything one way or the other or anything of that nature.
We consider two portions of these remarks troublesome; our first concern is the reference to the State's purported ability to pay any amount of punitive damages. Initially, it strikes us as artificial to analyze punitive damages against the State in the same manner as against a private individual or entity. In truth, the State has no net worth; there is no bottom line figure at the end of the fiscal year to which one could point as profit earned from wrongful actions, there are no assets purchased from funds wrongfully generated and held as capital to generate further profit. We consider that to be particularly true in an instance such as this, when the defendant is an executive department of State government, charged with the responsibility to fulfill one of the essential roles of government, as opposed to a State entity such as New Jersey Transit, the defendant at issue in Cavuoti, supra, which operates a transportation business and in many ways acts analogously to a private profit-making corporation.
Secondly, we consider the reference to the State's ability to incur a deficit to be of dubious validity in light of the debt limitation provisions of the State Constitution. N.J. Const. 1947, Art. VIII, § II, par. 3. The constitutional requirement "that the State's finances be conducted on the basis of a single fiscal year covered by a single balanced budget" precludes it from operating at a deficit. City of Camden v. Byrne, 82 N.J. 133, 151, 411 A.2d 462 (1980).[1]
The question of the proper method to assess an award of punitive damages against the Department is immensely complex. Neither the parties nor the trial judge, in our view, sufficiently appreciated that complexity at the time of trial. Some of the issues we perceive are the following:
1) Should a distinction be drawn between the Department of Corrections and the State as a whole? At first blush, it is difficult to perceive why the State's activities in areas other than the Department of Corrections should be considered when setting the quantum of an award.
*1106 2) If the Department's budget is the proper measure, what are the relevant budget years?
3) If the Department's budget has increased significantly over that time frame, what are the causes for the increase? If the budget has increased because changes in the sentencing provisions of the criminal code increased the number of persons incarcerated, should be Department's exposure to a large punitive damages award be concomitantly increased or is an adjustment appropriate?
4) If the Department's budget is the appropriate measure, is the allocation made by the Department among different line items a relevant factor? For example, does the Department spend a sufficient amount on employee training and awareness? Or, on the other hand, would consideration of such a factor represent an unwarranted judicial intrusion into executive decision making?
5) Should the jury be told that the State cannot incur a deficit and that an award of punitive damages may have to be satisfied through adjustments to another budget line item? We note, for example, that the Supreme Court has expressed the view that "ordinarily a jury informed of the legal effect of its findings ... is better able to fulfill its fact finding function." Roman v. Mitchell, 82 N.J. 336, 346, 413 A.2d 322 (1980). Thus, it has also concluded that juries deciding claims under the Consumer Fraud Act should be told that any damages they award under that statute will be trebled. Wanetick v. Gateway Mitsubishi, 163 N.J. 484, 495-96, 750 A.2d 79 (2000). A somewhat different approach was taken, however, in Weiss v. Goldfarb, 154 N.J. 468, 481, 713 A.2d 427 (1998) in which the Court held that a jury should not be told of the statutory cap on damage recoveries against hospitals.
We mention these few factors not because we have concluded they are necessarily determinative and certainly not in an attempt to be exhaustive. We seek merely to illustrate why, in our judgment, the guidance provided to the jury on this sensitive and complicated topic was inadequate. We are confident that on remand, other factors and considerations may also be brought forth.
We also recognize that in Gares, supra, the Court of Appeals declined to overturn a punitive damages award against the defendant municipality under LAD on the ground that there had been no evidence of its ability to pay. Plaintiff in that case, a member of the Township's police department, was subjected for years to a course of vulgar and obscene comments and unwanted advances. The jury included in its verdict punitive damages of $30,000. The Court of Appeals concluded that evidence the Township employed more than one hundred police officers was sufficient proof the Township could absorb the award in its budget. We do not consider that approach sufficient in the present matter.
We are compelled to note the State provided no real assistance to the trial court or to this court by way of identifying and analyzing what considerations could appropriately be utilized and which should be disregarded. We recognize that the question is one of enormous complexity and involves intersecting policy needs and concerns. Because of the significant public policy implications of this award, however, we have concluded that our judicial responsibility precludes us from leaving the award in place merely because inadequate analysis was provided by the parties. There has been no real attempt, in our view, to grapple with these complexities, a deficiency which must be cured on remand.

*1107 D
Having set forth the problems we perceive in the particular manner in which punitive damages were assessed in this case, we turn to case law as a backdrop to our analysis. In BMW of North America, Inc. v. Gore, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996), the Supreme Court concluded that substantive due process principles were fully applicable in reviewing an award of punitive damages in a state court. The Court concluded that three guideposts should be utilized in considering such an award:
the degree of reprehensibility of the [offending conduct]; the disparity between the harm or potential harm suffered by [plaintiff] and his punitive damages award; and the difference between this remedy and the civil penalties authorized.

[Id. at 575, 116 S.Ct. at 1598, 134 L.Ed.2d at 826.]
Applying those principles, the Court set aside a punitive damages award of $2,000,000 received by plaintiff Gore who, shortly after purchasing a new BMW, discovered it had been repainted prior to sale to repair damage it received in the course of shipment from the factory; the cost of repainting was $601.37 and Gore presented testimony the repainting diminished the value of his car by $4,000.
Our own Supreme Court, in Baker v. National State Bank, 161 N.J. 220, 231, 736 A.2d 462 (1999), explicitly adopted the substantive standards of BMW, supra, together with the requirements of our Punitive Damages Act, N.J.S.A. 2A:15-5.9 to -5.17, as the appropriate yardsticks for a LAD case to ensure that an award of punitive damages has a reasonable relationship to the injury inflicted. Baker is particularly instructive because the discriminatory conduct complained of in that case occurred before enactment of the Punitive Damages Act, as did the conduct in question here, and yet the Court had no hesitancy in using that statute as a guiding measure.[2]
Finally, the United States Supreme Court has, since this matter was orally argued before us, again taken up the question of judicial review of a punitive damage award. Cooper Indus., Inc. v. Leatherman Tool Group, Inc., 532 U.S. 424, 121 S.Ct. 1678, 149 L.Ed.2d 674 (2001). In that case, a jury found Cooper guilty of unfair competition and awarded Leatherman compensatory damages of $50,000 and punitive damages of $4.5 million. The District Court refused to set aside the punitive damages award as grossly excessive under BMW and the Court of Appeals affirmed, on the basis that the District Court had not abused its discretion in reaching that conclusion. The Supreme Court reversed, holding that the Court of Appeals erred when it reviewed the trial court's decision under an abuse of discretion standard. The correct standard, according to the Supreme Court, is a de novo standard of review.
We are satisfied, however, that these cases, while instructive, do not control our final analysis of the verdict here. We have included this discussion for purposes of completeness, lest another court in the future mistakenly conclude that we were unaware of these significant authorities and principles. That the amount the jury ultimately awarded in punitive damages, for instance, does not exceed the five-to-one *1108 ratio contained within the Punitive Damages Act, N.J.S.A. 2A:15-5.14, cannot, in our judgment, be used to save a verdict we consider irredeemably tainted in so many regards.

III
We turn now to the question of counsel fees. As we noted at the outset of our opinion, the trial judge, after reviewing the application for fees submitted by plaintiff's counsel and the opposition from the State, awarded plaintiff's counsel a total fee of $855,350.19. Again, the State contends the award is grossly excessive.
Counsel who prevail in a suit brought under LAD are entitled to recover a reasonable counsel fee. N.J.S.A. 10:5-27.1. Calculating a reasonable counsel fee is a multi-step process. The first step is to determine a reasonable hourly rate and then multiply that sum by the number of hours reasonably expended; the resulting figure is called the "lodestar." Rendine, supra, 141 N.J. at 334-35, 661 A.2d 1202. Determination of the lodestar amount has been described as the "most significant element in the award of a reasonable fee." Id. at 335, 661 A.2d 1202. After settling upon the lodestar, the court may, in appropriate cases, enhance that lodestar by a percentage amount to reflect the uncertainty of collection in contingent fee matters, id. at 338, 661 A.2d 1202, and, if warranted, that the litigation in some measure advanced the public interest. Id. at 341, 661 A.2d 1202.
Here, the State disputes the hourly rates allowed by the trial court, its acceptance of those rates ($325 per hour) for both of the named partners who participated in the trial of this matter and the enhancement of the lodestar allowed by the trial court (a multiplier of 60%). The rates are undoubtedly generous but we are not blind to the sums paid to experienced counsel in other matters.
In addition, it strikes us that the State's complaint that the trial court compensated both named partners for their trial participation comes with ill-grace. The State assigned two deputy attorneys general to handle the defense of this matter; we are entirely uncertain why plaintiff should be expected to proceed with a lesser staff to prosecute his claim. We have, in the course of preparing this opinion, carefully reviewed the entire transcript of this three-week trial. It is clear from that review that both plaintiff's counsel participated fully in all aspects of the trial, dividing between themselves responsibility for certain witnesses and for arguing legal issues. In certain contexts, the term "second chair" may be understood to mean an attorney who merely assists at trial and does not take the primary, laboring oar. We do not consider that such a term could fairly be employed in the present instance.
We turn then to the multiplier of 60% adopted by the trial court for services rendered through the time of trial. The Court in Rendine noted that "the enhancement in typical contingency cases [should] rang[e] between twenty and thirty-five percent of the lodestar." Rendine, supra, 141 N.J. at 343, 661 A.2d 1202. We do not think this case could be considered a "typical contingency" case and are unable to view the trial court's selection of 40% for contingency as unwarranted.
To this, the trial court added an additional 20% for the public interest served in advancing the purposes of LAD. In Rendine, the Court indicated its agreement with the plurality opinion in City of Riverside v. Rivera, 477 U.S. 561, 106 S.Ct. 2686, 91 L.Ed.2d 466 (1986) which acknowledged that "a civil rights plaintiff seeks to vindicate important civil and constitutional rights that cannot be valued solely in monetary terms." 141 N.J. at 336, 661 A.2d 1202.
*1109 There is no doubt that this case was hard-fought on both sides. No quarter was asked and none was given. The State was entitled to assert a vigorous defense and it did so. Fairness requires, however, that plaintiff's counsel be compensated for seeing the matter through to a successful conclusion.
In Rendine, supra, the Court began its discussion of setting fees under fee-shifting statutes with the observation that "[o]ur expectation is that future fee determinations by trial courts will be disturbed only on the rarest occasions, and then only because of a clear abuse of discretion." 141 N.J. at 317, 661 A.2d 1202. This is not such a rare occasion and there was no clear abuse of discretion; we decline to interfere with the award of counsel fees.

IV
Finally, we turn to the issues projected in A-1783-99. When Lockley began this suit, he named as defendants, in addition to the Department and Commissioner Fauver, Ronda Turner, her friend and co-worker Jacqueline Jones, and Local 105 of the Police Benevolent Association. Plaintiff included in his complaint a demand for equitable relief as well as for damages. Turner responded by filing suit against plaintiff and a television station for defamation and the two matters were ultimately consolidated.
Immediately before this trial began, Lockley, Turner and Jones settled all their disputes with one another. Lockley agreed to dismiss all his remaining claims against Turner and Jones and Turner agreed to dismiss her defamation action. Under the settlement terms, Turner and Jones agreed to make themselves available to testify at the trial of plaintiff's case.
After the jury returned its verdict, plaintiff filed a motion seeking post-trial equitable relief, including the six-month suspension of Turner and certain other corrections officers, the transfer of Turner and another officer from Mid-State, and the appointment of a monitor to oversee how the Department handled complaints of sexual harassment and retaliation.
It is not necessary to set forth the procedural complications that ensued in the disposition of this motion, which was heard by the same judge who presided over the trial. Suffice it to say that eventually he entered an order directing the Department to transfer Turner to another facility for six months. The order included a provision that "[i]n order to enforce the grant of equitable relief," he would:
retain[ ] jurisdiction for the six month period of Ronda Turner's transfer and for any time period thereafter during which additional applications are made by the Plaintiff for equitable relief ... pursuant to the Law Against Discrimination.
Turner has appealed from that order. Her transfer, however, was effective on September 15, 1999 and its term has long since expired. We do not read the order to provide for a retention of jurisdiction in perpetuity; we consider that period to have long since expired as well.
In that posture, we consider her appeal moot. Dismissal of the appeal is fully consonant with the long standing principle that courts do not attempt to resolve legal issues in the abstract. Zirger v. General Accident Ins. Co., 144 N.J. 327, 330, 676 A.2d 1065 (1996). The question of the trial judge's authority to mandate the transfer arose in a unique factual complex and is unlikely to recur. No benefit would be achieved by any party if we were to undertake a full analysis of the judge's authority to order this transfer after Lockley negotiated a full settlement with Turner.

*1110 V
In summary, in A-1835-99, we affirm in part and reverse in part and remand for further proceedings; A-1783-99 we dismiss as moot.
NOTES
[1] We note as a matter of interest that neither of the two cases in which the Supreme Court approved the concept of imposing punitive damages against a public entity involved a direct claim against a State department such as is presented here. One was a claim under the Conscientious Employee Protection Act, N.J.S.A. 34:19-1 to -9, (CEPA) against a municipal board of education for failure to rehire, Abbamont v. Piscataway Tp. Bd. of Educ., 138 N.J. 405, 650 A.2d 958 (1994), the other a claim against a public corporation. Cavuoti, supra. Municipalities, of course, are not subject to the debt limitations constitutionally imposed on the State. Graziano v. Mayor and Tp. Committee of Montville Tp., 162 N.J.Super. 552, 563, 394 A.2d 103 (App. Div.), certif. den., 79 N.J. 462, 401 A.2d 219 (1978). We express no views on whether the Supreme Court would consider that distinction of sufficient import to warrant a different analysis on the question of potential liability for punitive damages.
[2] The Punitive Damages Act is applicable to causes of action filed on or after October 27, 1995, L.1995, C.142, § 11. Lockley's complaint was filed in October 1994. Although the opinion in Baker does not explicitly state when the complaint was filed, the discriminatory conduct occurred in 1991 and the Court's opinion clearly states the statute was not applicable. 161 N.J. at 229, 736 A.2d 462.