**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-1483-16T3

MAURINE A. VILLAPANDO,

    Plaintiff-Appellant,

v.

RARITAN BAY MEDICAL CENTER,
ARNOLD DERMAN, M.D.,
VIRGINIA KO CHUA, R.N.,
and LIZA ABUNDO, R.N.,

    Defendants,

and

CARL NATH, M.D.,

    Defendant-Respondent.

_____

> Argued May 3, 2018 — Decided August 13, 2018
>
> Before Judges Haas, Rothstadt, and Gooden Brown.
>
> On appeal from Superior Court of New Jersey, Law Division, Middlesex County, Docket No. L-2845-12.
>
> Howard D. Crane argued the cause for appellant (Koerner & Crane, LLC, attorneys; Howard D. Crane, on the briefs).

Peter L. Korn argued the cause for respondent (McElroy, Deutsch, Mulvaney & Carpenter, LLP, attorneys; Peter L. Korn, of counsel and on the brief; William S. Mezzomo, on the brief).

PER CURIAM

In this foreign object medical malpractice case, plaintiff Maurine Villapando appeals from the December 2, 2016 Law Division order denying her motion for a new trial, following the October 25, 2016 jury verdict in favor of defendant Carl Nath, M.D, and the entry of the November 1, 2016 conforming judgment in favor of Nath. We affirm.

The underlying facts in this case are not in dispute. In August 2005, plaintiff went to the emergency room at Raritan Bay Medical Center (Raritan Bay), complaining of severe abdominal pain on her right side. The emergency room staff performed a physical examination, an ultrasound, and a CAT scan on plaintiff's abdomen and pelvis, which revealed an ovarian cyst. Dr. Nath, an obstetrician/gynecologist (OB/GYN) surgeon, performed a laparotomy, an open incision directly into the abdomen, to remove the cyst.

Per Raritan Bay's policy, a laparotomy involved three distinct "counts" of instruments and lap pad sponges performed by the nurses, who, in this case, were defendants Virgina Ko Chua, the circulating nurse, and Liza Abundo, the scrub nurse. Before

the surgery commenced, an initial count was conducted to determine the number of instruments and sponges circulating in the operating room. The second count occurred upon the initial closure of the peritoneal lining[1], wherein the nurses would count aloud for everyone in the operating room to hear. The third and final count occurred when the surgeon was ready to close the skin.

After the second and third counts, the nurses would verbally inform the surgeon that the count was correct and would document the count by denoting hash marks on a "count sheet" for each item removed from the operating field, including used sponges, in order to ensure that all items were accounted for. At the end of the procedure, the circulating nurse would sign the count sheet, indicating that the surgeon was verbally notified of the final count status, and the surgeon would acknowledge the count report by signing the count sheet.

In this case, although a total of thirteen lap sponges were used during plaintiff's surgery, the hash marks denoting the tally revealed a count of only twelve sponges retrieved, indicating that one sponge was unaccounted for. However, the circulating nurse mistakenly wrote the number "thirteen" next to the hash marks after adding them incorrectly. Neither nurse noticed the computing

---

[1] The peritoneal lining is "the lining of the abdomen underneath the skin."

error, and, after verbally advising Nath that the count was correct, Nath acknowledged the count by signing the count sheet.

Immediately after the surgery, another CAT scan was performed because plaintiff developed a fever and continued to have pain. However, according to Arnold Derman, the radiologist, the CAT scan did not reveal any abnormal findings in the abdomen and plaintiff was later discharged from Raritan Bay once her symptoms abated.

Approximately five years after the surgery, plaintiff injured her back and an x-ray was taken at U.S. HealthWorks. She was told that "something [was] wrong with [her] x-ray" and directed to see her primary care physician. After ordering a CAT scan, her primary care physician referred her to an OB/GYN. The OB/GYN performed a pelvic examination and "felt a mass on the right side of [plaintiff's] lower abdomen" that, based on the CAT scan, may have been a cancerous tumor. The OB/GYN referred plaintiff to an OB/GYN oncologist, who performed exploratory surgery on plaintiff in May 2010.

The 2010 surgery revealed that plaintiff had a large amount of scar tissue and a foreign object in her lower abdomen, which had attached itself to her ovary. The foreign object was the unaccounted for lap sponge from the 2005 laparotomy. As a result, plaintiff's right ovary and fallopian tube were removed and plaintiff, who was then thirty-one years old, was informed that

4                                                                          A-1483-16T3

she would not be able to get pregnant without some sort of assisted reproductive technology.

On February 20, 2013, plaintiff filed an amended medical malpractice complaint against Raritan Bay, Nath, Chua, Abundo, Derman, and various fictitious individuals and entities. In 2014, plaintiff's motion for partial summary judgment was granted, shifting the burden of proof to defendants Nath, Chua and Abundo.[2] In 2015, plaintiff settled with all remaining defendants except Nath, who proceeded to trial.[3]

A trial was conducted from October 11 to 25, 2016, during which plaintiff testified on her own behalf and introduced the deposition testimony of the OB/GYN oncologist who performed the 2010 surgery, as well as the testimony of a psychiatrist who evaluated her. Chua also testified for plaintiff and acknowledged that it was the nurses' responsibility to count the sponges. Chua admitted informing Nath that the count was correct and admitted that she did not notice the error in the tally nor how it occurred.

---

[2] In a March 14, 2014 order, the complaint was dismissed with prejudice against Raritan Bay Medical Center.

[3] Based on the court's burden shifting ruling, at trial, Nath had to prove by a preponderance of the evidence that he was not negligent. If he failed to do so, then the jury would consider the conduct of the settling defendants, and the burden of proving that the settling defendants were at fault rested on Nath. See Lucia v. Monmouth Med. Ctr., 341 N.J. Super. 95, 107-08 (App. Div. 2001).

Nath testified on his own behalf and confirmed that he was verbally informed by the circulating nurse that the counts were correct. Although he signed the count sheet, he testified that he had never been involved in sponge counts or count sheets, and was not responsible for verifying the nurses' counts. According to Nath, he did not read the entire form before signing and his signature on the count sheet simply meant that he "was told that the . . . counts were correct." Nath also presented the testimony of a diagnostic radiologist who detected "a foreign body" in the CT scan of plaintiff's abdomen performed three days after the 2005 surgery, a psychiatrist who evaluated plaintiff, and Geraldine Giovanni, a retired registered nurse with forty-five years of experience at Raritan Bay.

As to Nath's compliance with the applicable standard of medical practice in the OB/GYN field, plaintiff presented the expert testimony of Dr. Richard Luciani, an OB/GYN. In turn, Nath presented the expert testimony of Dr. Anthony Quartell and Dr. Myles Dotto, who, like Luciani, were both OB/GYNs. Luciani admitted that at the two hospitals where he worked, "the responsibility for counting all of the sponges . . . rest[ed] with the nurses" and surgeons were not responsible for the sponge count. In fact, he testified that once the nurses complete the count, they indicate that the count is correct verbally, and the surgeons

6

acknowledge by saying, "[t]hank you very much," and do not double check the nurses' count.

Notwithstanding this practice, Luciani testified that:

> The standard . . . in [m]edicine . . . in terms of documents is very, very simple. When a doctor signs a document in [m]edicine, whether it be an operative report, a progress note, a nurse's note, an order on a chart, [or] a count form, . . . if you're told that you have to sign it, the standard of care is to read it, because the contents of those particular medical documents can have an impact on the health and welfare of the patient.

Luciani continued:

> [I]n this particular hospital, they have a protocol that the doctor has to sign this form. Are we to believe that the protocol is that the doctor has to sign the form, but . . . the hospital doesn't care if the doctor reads it? He just has to sign it. . . . Is that the most ludicrous thing . . . you or I have ever heard? You have to sign it, but you don't have to read it.
>
> So the bottom line is in [m]edicine when you sign a document, you read the document before you sign it.

Luciani explained that Nath's mistake was "not reading what he was signing," which led to the sponge being left in plaintiff's abdomen. According to Luciani, because "[s]even lap pads were not used, . . . that would mean that there were [thirteen] that went in the abdomen, because there were [twenty] to begin with." Luciani continued:

7

[H]ad Dr. Nath, who signed this [form] read this appropriately, which is the standard of care, he would . . . see that there were [twelve] that came off the field so this could not have been a final count . . . and the question would be, "[w]ell, where's the sponge?" And they would have counted.

In contrast, Quartell opined that Nath "complied completely with accepted standards." Quartell testified that Raritan Bay's policy requiring the surgeon to acknowledge the count sheet at the end of the procedure via signature was something he "had never seen . . . before" and was not a requirement in other hospitals. In his opinion, the policy meant that the surgeon "acknowledge[d] the fact that the nurse told him that the sponge counts were correct." When asked if he was aware of any practice where surgeons were required to double check the nurses' arithmetic, he responded, "No, not at all," and it made no sense to him why this policy would be in effect.

He elucidated that the standard of care he was familiar with, which was what every operating room he had ever worked at did, was that

> when you operate, at the end of the operation[,] the scrub tech and the circulating nurse do the count, and you let them know when you're closing the . . . peritoneum, . . . you say . . . we're closing now, and they'll come back and say count is correct. And then when you're about to close the skin[,] they do a second count and they tell you . . . that count is correct also.

A-1483-16T3

When questioned about the surgeon's response after the nurses read the counts aloud, Quartell replied, "You just say thank you," which was an acknowledgment that you correctly heard their count. While acknowledging that he had trained Luciani and worked with him at Saint Barnabas, Quartell found Luciani's opinion to be "ludicrous" because Saint Barnabas followed the same procedure he (Quartell) described where surgeons were not required to double check the arithmetic of the nurses, but rather acknowledge that the counts were what the nurses relayed to them. According to Quartell, "[n]ever anywhere does it say you're supposed to count hash marks and figure it out."

Likewise, Dotto agreed that Nath "compl[ied] with . . . the standard[] of care." He testified that the nurses performed the sponge counts and reported to the surgeon that the counts were correct. The surgeon then did "nothing further" besides closing up the patient. When asked whether surgeons typically relied upon the sponge counts conveyed to them by the nurses, he responded, "Yes, absolutely." He explained that the significance of the acknowledgement policy at Raritan Bay was to corroborate that "the sponge counts were reported as correct." When asked whether he had ever encountered a surgeon double checking a sponge count in

9

the operating rooms he worked in, he unequivocally responded, "No, never."

During her forty-five year career at Raritan Bay, Giovanni had worked as a circulating nurse, scrub nurse, coordinator, supervisor, and manager.  She was ultimately promoted to Director of Surgical Services.  She testified that she was directly involved in drafting the hospital's count sheet policy and explained that the word "acknowledge" in the policy meant that the surgeon was acknowledging "[w]hatever [count] the circulating nurse told him. If she told him that . . . the count was correct, that's what he [was] acknowledging."  According to Giovanni, in all her years working in the operating room at Raritan Bay, she had "never seen [a surgeon] go over the math" on the form.

At the conclusion of the trial, the jury reached a verdict in favor of Nath, finding by a vote of 7-1 that he proved by a preponderance of the credible evidence that he did not deviate from accepted standards of medical care in his treatment of plaintiff. Accordingly, the trial judge entered judgment in favor of Nath.  Following the trial, plaintiff moved for a new trial, asserting that Nath failed to articulate a standard of care.

On December 2, 2016, the trial judge denied plaintiff's motion on the papers.  In an oral decision placed on the record on December 22, 2016, applying Rule 4:49-1, the judge found no clear

and convincing evidence of "any miscarriage of justice under the law." The judge determined that "there was sufficient evidence to sustain [the] verdict," and "there [was] no legal or factual basis to disturb the verdict of the jury." In rendering his decision, the judge related that the evidence showed that Nath "did not perform the count" and "did not oversee the count." Instead, "[i]t was the responsibility of the nurses" to perform the count correctly, and "Nath was then asked to sign a document" which acknowledged "that the count had occurred." In fact, the judge recalled that at counsel's request, the jury had been instructed on the definition of the word acknowledge.[4]

The judge continued that even the plaintiff's expert acknowledged "that even in [his] practice [he] had never been required to sign off on a count sheet and [he] ha[s] always relied upon the nursing staff to provide [him] with oral acknowledgment that the count was correct which was [the] procedure followed by Dr. Nath." The judge noted further that the defense experts testified that "Nath met the standard of care simply by signing

---

[4] Indeed, from one source, the judge instructed the jury on the definition of acknowledge as "to say that you accept or do not deny the truth or existence of something; to regard or describe someone or something as having or deserving a particular status; and . . . to tell or show someone that something such as a letter or message has been received." The judge defined acknowledge from another source as "to recognize as a fact; admit the truth of."

the count sheet . . . which acknowledged that the nursing staff had informed him that the count was correct."  Moreover, according to the judge,

> [b]oth defense experts testified that Dr. Nath was not obligated to read the count sheet and make certain that the nurses' calculations as to the number of pads inserted and removed were correct, simply that he was required . . . by the hospital under their particular procedures to sign that document.

The judge also explained that in addition to the expert testimony, DiGiovanni "confirmed that the protocol at the hospital for a surgeon under these circumstances was to sign that sheet so as to simply acknowledge that the surgeon had received an oral confirmation from the nursing staff that the count was complete and was correct."  The judge continued that "DiGiovanni testified that in her [forty] years of experience at Raritan Bay . . . she never witnessed a surgeon reviewing the sheet to confirm a correct count."  Thus, the judge concluded that given the "testimony from experts as well as [lay] witnesses that Dr. Nath had comported with the standard of care applicable to a gynecological surgeon under the circumstances and . . . acted within the hospital's protocol within the operating suite," the "jury simply rejected the plaintiff's argument that . . . Dr. Nath was negligent in some fashion."  This appeal followed.

We begin with the well-established fundamental principle that jury trials are the cornerstone of our civil jurisprudence and that the fact-finding functions of a jury deserve a high degree of respect and judicial deference. See, e.g., Lockley v. Turner, 344 N.J. Super. 1, 13 (App. Div. 2001), modified and aff'd, 177 N.J. 413 (2003). A jury verdict is "impregnable unless so distorted and wrong, in the objective and articulated view of a judge, as to manifest with utmost certainty a plain miscarriage of justice." Doe v. Arts, 360 N.J. Super. 492, 502-03 (App. Div. 2003) (quoting Carrino v. Novotny, 78 N.J. 355, 360 (1979)). Thus, a trial judge shall grant a new trial only where "it clearly and convincingly appears that there was a miscarriage of justice under the law." R. 4:49-1; see also Dolson v. Anastasia, 55 N.J. 2, 7 (1969).

Our Supreme Court has described the miscarriage of justice standard as:

> a pervading sense of "wrongness" needed to justify [an] appellate or trial judge undoing of a jury verdict . . . [which] can arise . . . from manifest lack of inherently credible evidence to support the finding, obvious overlooking or under-valuation of crucial evidence, [or] a clearly unjust result.
>
> [Risko v. Thompson Muller Auto. Grp., Inc., 206 N.J. 506, 521 (2011) (alterations in original) (quoting Lindenmuth v. Holden, 296 N.J. Super. 42, 48 (App. Div. 1996)).]

13

In deciding a motion for a new trial, the trial judge must "canvass the record, not to balance the persuasiveness of the evidence on one side as against the other, but to determine whether reasonable minds might accept the evidence as adequate to support the jury verdict." Kulbacki v. Sobchinsky, 38 N.J. 435, 445 (1962).

We review a trial judge's decision on a new trial motion under the same standard. Dolson, 55 N.J. at 7; R. 2:10-1. We must make our own determination as to whether there was a miscarriage of justice, but defer to the trial judge with respect to "intangible aspects of the case not transmitted by the written record," such as, "witness credibility and demeanor and the 'feel of the case.'" Carrino, 78 N.J. at 360-61 n.2 (quoting Pressler, Current N.J. Court Rules, comment 4 on R. 2:10-1 (1979)). In reviewing a trial judge's decision on a motion for a new trial, we view the evidence in a light most favorable to the party opposing the new trial motion. Caldwell v. Haynes, 136 N.J. 422, 432 (1994).

With these principles in mind, we are satisfied that the evidence was such that the jury could reasonably have found that Nath was not negligent in operating on plaintiff. Thus, there was no "miscarriage of justice." On appeal, plaintiff argues that Nath failed to meet his burden of proof by failing to provide

14

expert testimony setting forth "the generally accepted standard of care as it applies to the circumstances here where a surgeon signs the sponge count sheet." Instead, according to plaintiff, Nath only provided expert testimony about "the standard of care . . . for situations where the hospital protocol does not require the surgeon to sign the sponge count sheet." As such, plaintiff asserts she was entitled to a judgment against Nath on the issue of liability and "the jury had no basis in the evidence to come to its conclusion." We disagree.

As a general rule, "a plaintiff in a medical malpractice action must prove the applicable standard of care, that a deviation has occurred, and that the deviation proximately caused the injury." Verdicchio v. Ricca, 179 N.J. 1, 23 (2004) (citations omitted). However, in very limited circumstances, such as occurred here, the plaintiff's burden of proof will be shifted to the defendants. Anderson v. Somberg, 67 N.J. 291, 298-301 (1975).

In Anderson, our Supreme Court established a bright line rule that

> where an unconscious or helpless patient suffers an admitted mishap not reasonably foreseeable and unrelated to the scope of the surgery (such as cases where foreign objects are left in the body of the patient), those who had custody of the patient, and who owed him a duty of care as to medical treatment, . . . can be called to account for their default. They must prove their

nonculpability, or else risk liability for the injuries suffered.

[67 N.J. at 298.]

The Court held that in those instances, "a mere shift in the burden of going forward . . . is insufficient." Id. at 300. Rather, "not only the burden of going forward shift[s] to defendants, but the actual burden of proof as well." Ibid. In Estate of Chin v. St. Barnabas Med. Ctr., 160 N.J. 454 (1999), our Supreme Court reaffirmed the application of the Anderson principles where a "case presents a fact pattern that mirrors that presented in Anderson." Chin, 160 N.J. at 465.

Here, our review of the trial record does not support plaintiff's contention that defendant failed to meet his burden of proof. On the contrary, defendant's experts established the applicable standard of care in the field of OB/GYN. They explained that surgeons are not required nor expected to verify the arithmetic of the nurses who perform the count, but simply acknowledge verbally that the nurses stated the count was correct. Indeed, all the experts, including plaintiff's expert, admitted that they had never seen a hospital protocol like Raritan Bay's where the surgeon was required to acknowledge the count sheet by signing it. Instead, they all opined that the circulating nurse was solely responsible for performing the count correctly, and the

16

surgeon had no duty to verify the accuracy of the count. Thus, regardless of Raritan Bay's unique protocol, the standard of care delineated by all three experts was the accepted practice in the medical community.

Under Raritan Bay's protocol, the surgeon's acknowledgement on the form simply indicated that the nurses' verbal count was provided to him or her. In fact, DiGiovanni explicitly stated that the protocol did not create an added responsibility on the part of the surgeon to double check the counts.[5] We also reject plaintiff's contention that the defense experts' testimony regarding their own personal standards resulted in a manifest injustice. "[T]he weight to be given to the evidence of experts is within the competence of the fact-finder." LaBracio Family P'ship v. 1239 Roosevelt Ave., Inc., 340 N.J. Super. 155, 165 (App. Div. 2001). Therefore, the fact-finder is free to "accept

---

[5] We reject plaintiff's contention that DiGiovanni's testimony was "totally irrelevant" and "should not have been allowed." As a fact witness, DiGiovanni's testimony was permissible under N.J.R.E. 602, as she had extensive personal knowledge of the hospital's protocol and how the sponge count was performed based on her forty-five years of experience at Raritan Bay Medical Center. Moreover, N.J.R.E. 701 permits a lay witness's "testimony in the form of opinions or inferences . . . if it (a) is rationally based on the perception of the witness and (b) will assist in understanding the witness' testimony or in determining a fact in issue." To the extent DiGiovanni's testimony represented an opinion on the hospital's protocol, it was permissible under N.J.R.E. 701.

some of the expert's testimony and reject the rest." State v. M.J.K., 369 N.J. Super. 532, 549 (App. Div. 2004).

Moreover, the jury was properly instructed that "[w]hen determining the applicable standard of care, [they] must focus on the accepted standards of practice in OB/GYN surgery, radiology and the standards applicable to the surgical nurses, and not based upon the personal subjective belief or practice of a particular defendant." We presume that the jury followed the judge's instructions. State v. Burns, 192 N.J. 312, 335 (2007) ("One of the foundations of our jury system is that the jury is presumed to follow the trial court's instructions."). Therefore, on this record, we are satisfied that there is no basis for our intervention because the jury's verdict is sound.

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

18

A-1483-16T3