794 A.2d 185 (2002)
349 N.J. Super. 527
Diane MANCINI, Plaintiff-Respondent/ Cross-Appellant,
v.
TOWNSHIP OF TEANECK, Teaneck Police Department, Donald Giannone, individually and in his capacity as Chief of the Teaneck Police Department, and Warren White, individually and in his capacity as Captain of the Teaneck Police Department, Defendants-Appellants/ Cross-Respondents.[1]
Superior Court of New Jersey, Appellate Division.
Argued February 6, 2002.
Decided April 2, 2002.
*188 Barry Asen, Newark, argued the cause for appellants/cross-respondents (Epstein, Becker & Green, attorneys; Mr. Asen, of counsel and on the brief).
Harold J. Ruvoldt, Jr., Asbury Park, argued the cause for respondent/cross-appellant (Edwards & Angell, attorneys; Cathy Fleming and Mr. Ruvoldt, Jr., of counsel; Mr. Ruvoldt, Jr. and Ms. Fleming, on the brief).
Before Judges BAIME, NEWMAN and AXELRAD. *186
*187 The opinion of the court was delivered by AXELRAD, J.T.C. (temporarily assigned).
Plaintiff, Diane Mancini, was the trailblazer by being the first female police officer in Teaneck. This appeal and cross-appeal arise out of her claims of sexual harassment and retaliation by the Teaneck Police Department.
Plaintiff filed a sexual harassment and retaliation suit against defendants, Township of Teaneck ("Township"); the Teaneck Police Department ("Department"); Donald Giannone, the present chief of police of the Department; and Warren White, a former captain in the Department.
The jury awarded plaintiff $1 million in compensatory damages for emotional distress (divided equally between her claims of sexual harassment and retaliation), and $500,000 in punitive damages. The judge reduced the $1.5 million verdict to $625,000 by remitting the $500,000 harassment award to $125,000 and vacating the punitive damages award.
Defendants appeal several trial court rulings and the verdict in plaintiff's favor. On appeal, defendants raise nine points including: the court erred by allowing plaintiff to bring in time-barred evidence and inadmissible evidence; plaintiff failed to establish a prima facie case of retaliation; and the sexual harassment compensatory damages should be substantially reduced. More particularly, defendants contend:
POINT I
A NEW TRIAL SHOULD BE ORDERED BECAUSE THE JURY IMPROPERLY HEARD EVIDENCE AND AWARDED DAMAGES CONCERNING TIME-BARRED EVENTS.
POINT II
PREJUDICIAL ERROR OCCURRED WHEN THE TRIAL JUDGE PERMITTED THE JURY TO CONSIDER THE INFLAMMATORY ITEMS THAT MANCINI FOUND IN HER DEPARTMENT MAILBOX, BUT NEVER COMPLAINED ABOUT TO DEPARTMENT MANAGEMENT.
POINT III
THE TRIAL COURT'S ADMISSION OF EVIDENCE CONCERNING WARREN WHITE ALLEGEDLY FOLLOWING AND SEXUALLY HARASSING OTHER WOMEN IN THE 1980'S WAS PREJUDICIAL ERROR.
POINT IV
THE TRIAL JUDGE'S ADMISSION OF EVIDENCE CONCERNING ALISON McMANUS MILLER'S LAWSUIT AGAINST THE DEPARTMENT WAS PREJUDICIAL ERROR.
POINT V
DEFENDANTS WERE UNDULY PREJUDICED BECAUSE THE TRIAL *189 JUDGE PRECLUDED THEM FROM INTRODUCING EVIDENCE WHICH PLACED MANCINI'S SEXUAL HARASSMENT CLAIM AND EMOTIONAL DISTRESS IN CONTEXT.
POINT VI
ASSUMING, ARGUENDO, THAT THIS COURT DOES NOT GRANT A NEW TRIAL, IT SHOULD SUBSTANTIALLY REDUCE MANCINI'S $500,000 AWARD FOR EMOTIONAL DISTRESS DUE TO SEXUAL HARASSMENT.
POINT VII
MANCINI'S RETALIATION CLAIM SHOULD BE DISMISSED AS A MATTER OF LAW BECAUSE SHE FAILED TO ESTABLISH A PRIMA FACIE CASE.
POINT VIII
EVEN IF MANCINI ESTABLISHED A PRIMA FACIE CASE OF RETALIATION, A NEW TRIAL SHOULD BE ORDERED BECAUSE THE VERDICT WAS AGAINST THE WEIGHT OF THE EVIDENCE AND A MISCARRIAGE OF JUSTICE.
POINT IX
ASSUMING THAT MANCINI'S RETALIATION CLAIM IS NOT DISMISSED OR REMANDED FOR A NEW TRIAL, THE $125,000 EMOTIONAL DISTRESS DAMAGES AWARD SHOULD BE VACATED OR SUBSTANTIALLY REDUCED.
On cross-appeal, plaintiff claims that the court erred in remitting a portion of the jury's retaliation award and vacating its punitive damages award. She seeks reinstatement of the full $500,000 jury award on her retaliation claim and the $500,000 punitive damages award against the Township and Department.

I.
On June 12, 1996, plaintiff and her secretary, Lauren Florio, filed a nine-count complaint alleging claims of sexual harassment, sex discrimination and retaliation in violation of the Law Against Discrimination ("LAD"), N.J.S.A. 10:5-1 to -42, and intentional infliction of emotional distress.
On July 14, 1998, defendants moved for partial summary judgment, seeking to dismiss, inter alia, plaintiff's claims of sexual harassment, sex discrimination, and intentional infliction of emotional distress, alleging that the statute of limitations had run. This motion was denied by the court and we denied leave to appeal.
On May 10, 1999, defendants moved for summary judgment on all claims. The court heard oral argument, and on January 6, 2000, issued a written opinion and order, (1) dismissing plaintiff's intentional infliction of emotional distress claim; (2) dismissing her punitive damages claims against Giannone and White, but permitting them to stand against the Township and the Department; and (3) denying judgment to defendants on claims of continuing violation, sexual harassment, sex discrimination, and retaliation.[2]
Defendants filed a motion, dated June 2, 2000, seeking to exclude plaintiff's evidence of alleged sexual harassment by unknown persons and co-workers about which she did not complain and which defendants did not know about, and evidence of White's alleged sexual harassment of other women in the 1980's that plaintiff did not know about at that time. The court denied the motion in its entirety.
*190 Defendants moved for a directed verdict on all claims after plaintiff rested after seven days of trial. The court dismissed plaintiff's sex discrimination claim, but permitted her sexual harassment and retaliation claims to go to the jury. On June 27, 2000, the jury returned the aforementioned verdict.
Defendants moved for judgment notwithstanding the verdict, or in the alternative, for a new trial or remittitur. Plaintiff moved for counsel fees, costs, and prejudgment interest.
On November 16, 2000, the court reduced the $1.5 million verdict to $625,000 by remitting the $500,000 harassment award to $125,000 and vacating the $500,000 punitive damages award. The court awarded counsel fees of $642,380.90, costs of $20,280.61, and denied prejudgment interest. On November 21, 2000, the court issued an amended opinion with changes to the fact findings. On December 6, 2000, the court issued a second amended opinion with a reduction of counsel fees to $625,272.21.

II.
In order to fully address the issues raised on appeal, it is necessary to recount the salient portions of the testimony adduced at trial, delineated in terms of specific conduct and incidents.
Plaintiff was hired by the Department in 1981 as its first female police officer. At the time of trial there were eight female Township police officers out of a total of ninety-seven officers, the highest percentage of female officers in Bergen County.
From the time plaintiff was hired in 1981 until 1991, Brian E. Burke was chief of police. During Burke's interview of plaintiff, he had asked if she was going to have more children. He claimed that he was concerned about someone working and taking care of children, but acknowledged that he probably had never asked a male the same question.
Burke testified that he had been reluctant to hire plaintiff because Township officers work alone and he was not sure that women could back up men. He was not convinced that women were strong enough physically to intervene when there were bar brawls or family fights. He had specifically thought plaintiff was too slight. At trial, he testified that he still had concerns about women as police officers but women had admirably proven themselves.
Plaintiff testified that when she was first hired, other members of the Department did not like it because they felt women did not belong on the job and would not be able to handle themselves properly. Lieutenant Norman Levine, one of defendants' witnesses, testified that there were men in the 1980's who did not want women on the force.

A. LOCKER ROOM FACILITIES
For her first four years on the force, there was no women's locker room and plaintiff had a locker in the men's locker room. After assignment of a locker in the center of the men's locker room, plaintiff complained to Burke because men were taking showers and walking around naked. She testified that Burke had told her that he did not expect that she would make it as an officer, that he did not want women on the job, and that it was not going to be easy. She claimed he said that the Department was not going to accommodate her and that if she wanted to stay, he had a mattress waiting for her in his closet, which comment Burke denied. Plaintiff interpreted it to mean that if she had some type of sexual relationship with Burke, then he would make her job easier.
Plaintiff then received a locker in the hallway at the bottom of the stairs leading *191 into the main men's locker room area. She came to work in full uniform and only used the locker to store equipment. Plaintiff and Detective David P. Kelter, one of her witnesses, both testified that she used to stand at the top of the stairs and ask if the coast was clear, and then she would come down to her locker. Several times someone told her the coast was clear and it was not. She saw one man naked, some officers wearing towels, and many men in underwear. Burke testified that he never saw anyone naked in the locker room.
Plaintiff spoke to Burke about the lack of a shower. She claimed that she told him she needed a shower and he made several suggestions, including that he would hold a watering can over her head to give her a shower and that he would be happy to wash her. Burke denied saying this but on cross-examination agreed that he had made the comment and could not understand how it could be offensive.
Another time when plaintiff returned to the station house covered in blood, she claimed that Burke stated that he would wash the blood off of her body and clean her up, which comment Burke denied making. Plaintiff stated that she had been offended, humiliated, and intimidated by Burke's comments.
Plaintiff did not get separate locker room facilities until she became a member of the union and worked on the pay raise committee. In a June 20, 1985 consent award, the committee negotiated a raise and a change in contract but she would not accept the settlement until they put a clause in the contract saying she was entitled to separate facilities. Burke claimed that there had not been a women's locker room because of budget constraints and that he had tried his best to accommodate her by placing a lock inside the door of the women's lounge.

B. PORNOGRAPHIC MAGAZINES AND PINUPS
Plaintiff and Kelter testified that pinups were posted in the locker room for everyone to see. In the early years, plaintiff found copies of Playboy and Hustler in patrol cars. Kelter called this a common occurrence in the early 1980's. Detective Warren Blanco, one of plaintiff's witnesses, who started working for the Department in 1982, stated that a number of times he had found Playboy magazines in squad cars and Playboy pinups had been taped to rearview mirrors. Defendant Chief Donald Giannone testified that he never saw pornographic magazines in any squad car in the 1980's. Plaintiff stated that officers would leave pornographic magazines around in the tour commander's office and in police cars, or put centerfolds on their lockers. Blanco testified that Playboy centerfolds were posted on the outside of the locker room doors. Burke admitted that he had been aware of pornographic magazines in patrol cars but could not remember any specifics. Defendant, Captain Warren White, who was called as plaintiff's witness, testified that, on occasion, he saw such magazines in patrol cars.
Plaintiff also saw these magazines stockpiled in a box in the tour commander's office and complained about this to other officers. She did not complain to superiors because it was a common practice in the Department and many of the sergeants and lieutenants were reading the magazines. Burke remembered seeing some pinups of scantily clad or naked women on bulletin boards or posted in a hallway.
White claimed that from 1981 to 1985 he saw calendars with women in bathing suits posted on some lockers, but never saw a naked woman's picture on the outside of a locker. On one or two occasions he saw a portion of a Playboy or similar magazine inside a locker. When he was an officer, *192 Lieutenant Frederick Green, defendants' witness, testified he saw Playboy magazines in patrol cars but never saw any centerfolds attached to lockers.
Officer John Sholdes, plaintiff's witness, hired by the Department in 1993, testified that when he was hired, he occasionally found pornographic magazines in the glove compartment of police cars. Plaintiff saw pornographic magazines on a desk in the juvenile bureau in 1998.
In addition, in 1996 plaintiff observed officers collecting female weightlifting books with centerfold-type pinups of female bodybuilders. One was posted on the refrigerator door in the officers' lunchroom, one was in the gym where there was also a full box of magazines, and one pinup was on the bulletin board in the main hallway of the building.

C. SEXUAL CARTOONS/MAILBOX PARAPHERNALIA AND VIDEOS
In the period from 1981 to 1987, plaintiff testified that cartoons were placed in her mailbox and posted in the station house. Soon after she was hired, someone placed a motel key, and later panties, in her Department mailbox. In 1987 or 1988, plaintiff received a note in her mailbox that referred to her as a "back stabbing c-t."[3] She was not sure whether she complained about the key or panties, but believed that people in authority in the Department knew about both incidents. Blanco testified that he saw a motel key and women's underwear in plaintiff's mailbox in the early to mid-1980's. Giannone testified that plaintiff did not tell him about the motel key and panties and that he was not aware of them until 1996 when this lawsuit started. Burke claimed that plaintiff never complained about any inappropriate cartoons, the key, or the panties.
In 1992, plaintiff found an undated police report in her mailbox that listed the complainant's name as "the midnight squad(s)." Twice the author called her a "fucking c-t" and stated that "[w]e do the best we can on the midnights but its nesver [sic] ever right."
In the 1990's, plaintiff saw sexual cartoons and jokes in the tour commander's office, in the record bureau, and in Lieutenant Burns' office. Plaintiff saw hundreds of cartoons pertaining to a variety of topics, including nasty rumors and jokes, and sexual cartoons. Some pertained to her and some to other women. She estimated that she saw twenty-five to fifty cartoons over the years that referred to sexual conduct or slang words for women's body parts. She saved fourteen of them, with the earliest dating from 1984 and the latest from around 1994. She saw the last ones posted in February 1996.
Blanco testified that he remembered seeing cartoons of a sexual nature from around 1983 to 1990, and that most of them depicted plaintiff. He saw them on a weekly basis, and they were posted in the typing room, squad room, and locker room. Green never saw any sexual cartoons about plaintiff or anyone else in the Department. White never saw any cartoons involving sexual conduct. Giannone never saw a sexually-oriented cartoon about plaintiff.
Burke was aware of cartoons about other people but not plaintiff. He did not remember any cartoons of a sexual nature involving a female officer. He never issued any orders not to post cartoons. Levine saw cartoons of a sexual nature, but none about plaintiff.
In February 4, 1993, Captain Walter Pinches issued the following order:
*193 "Whenever a Captain is working the evening shift, the Tour Commander will not take their [sic] meal period during the time the Captain is on his." Thereafter, an obscene cartoon appeared in plaintiff's mailbox and was posted in the station house. It depicted plaintiff and Captain Patrick Hogan, her immediate supervisor, engaging in sex and referred to Pinches's order. Plaintiff testified that she was mortified and that it was the most disgusting thing she had ever seen. She stated that she did not like it displayed at trial and wished that counsel would take it down. She was unable to identify the author and had not complained about this cartoon to her supervisors.
Giannone and Pinches issued directives, dated March 23, 1994, and April 4, 1994, banning graffiti, posters, drawings, and caricatures from "anywhere within headquarters," including placement on individual desks. Plaintiff stated that the March memo was the first time that management stated that it was inappropriate to post cartoons. On March 24, 1994, the president of the Teaneck Local of the Policeman's Benevolent Association ("PBA") also issued a memo stating:
On March 23, 1994, Captain Pinches issued a memo to all members of the Police Department concerning "Graffiti/Caricatures". On March 24, 1994, another caricature appeared in Police Hqtrs..
Chief Giannone has relayed to me that any member of the Department found to be in anyway responsible for the creation or display of any offending material WILL BE TERMINATED FROM HIS/HER POSITION OF EMPLOYMENT with the Township of Teaneck. These are the direct orders of Mr. Gary Saage, Township Manager.
All members are warned to cease these activities immediately!
Gary Saage, the Township's Municipal Manager since June 1, 1991, one of plaintiff's witnesses, also testified that after Giannone issued the memo that no cartoons or obscene materials should be posted, another caricature was posted.
Plaintiff testified that in 1981, on the midnight shift, officers would bring in pornographic movies to watch in the station house. She did not see the movies being played, but they were openly talked about and she saw the cassettes. When movies were shown, plaintiff was out on patrol and would ask to come back to the station house, but Lieutenant George Wagner would not let her come back and would send her out on another call or send her to get coffee. She did not file a grievance because she was trying to fit in.
Burke claimed to have no knowledge of the movies at that time but White saw such films being shown in the 1980's. Blanco remembered that Wagner was present and plaintiff was out on patrol when the movies were shown, and that Wagner would tell the dispatcher not to let her come back to the station. Kelter also remembered that Wagner was present and that pornographic movies were shown during the 1980's a couple of times each month. Giannone stated that he first heard about the pornographic movies when Allison McManus Miller ("McManus") filed her lawsuit in 1992.
Saage believed that the most serious allegation was these pornographic movies, and he would have instigated proceedings against the lieutenant involved if that lieutenant had still been on the force.
In the early 1980's, officers also watched exercise videos. Plaintiff remembered that Lieutenant Mason asked her if she could bend over the way the exercise ladies on television did, and whether her *194 chest bounced like the women's chests in those programs.
One time in 1987 or 1989, while plaintiff was a sergeant, three officers borrowed a television with a VCR and were in the juvenile bureau watching movies. Plaintiff went to work and tried to unlock the door and the key did not work. When she finally entered, she saw a group of men from the burglary squad and the detective bureau and Lieutenant Burns, and they started laughing and made jokes. She complained to Burns about being locked out, but to no one else.
Plaintiff also testified that during 1991, police officers continued to watch pornographic movies in the station house.
According to plaintiff, when incidents happened early in her career, she often did not complain because she had expected some mild harassment. She was prepared because before being hired she spoke to a psychiatrist about this, and Captain Croonquist had told her about it and advised her to try to fit in and prove herself by not complaining for a couple of years.

D. DEROGATORY NAMES, GESTURES, AND INAPPROPRIATE COMMENTS
Plaintiff was referred to as the white witch, the henchman, and a bitch. Blanco testified that in late 1989, he heard Pinches call plaintiff the white witch. Some officers, including Lieutenant Woods, also called her "Boom Boom." Sergeant Philip Andre Lavigne and Officer Robert Hunt called her henchman and witch. Burke never heard her called henchman, white witch, bitch, or c-t but did remember the name "Boom Boom." He knew "Boom Boom" was associated with a boxer and could not understand how it could be construed differently.
In 1989, Officer Lavigne walked by plaintiff's office door and made an obscene gesture commonly known as "giving one the finger." Lavigne testified that he did it, but really had no reason for doing it. Plaintiff wrote up the incident in a report to Giannone, but did not request any charges. Giannone testified that plaintiff should have taken immediate, effective action.
In 1993, plaintiff, who was a lieutenant at that time, complained about being referred to as "honey" or "sweetie." Giannone testified that plaintiff complained to him that Pinches called her "dearie." In a June 3, 1993 inter-office memorandum to the Department, Giannone reminded all personnel to treat both superior and subordinate officers with respect and not to use terms such as "dear, honey, or sweetie."
Sholdes had a conversation with Levine where Levine referred to plaintiff as c-t, which Levine admitted, although he claimed that Sholdes had used the term thousands of times. Levine was Sholdes's supervisor and conceded he knew it was not appropriate to refer to plaintiff in that way, but believed that police work was unique in its use of raw language.
On November 24, 1993, plaintiff sent a memo to Giannone, entitled "Sexual harassment." She complained that in a conversation Pinches had with another officer he referred to her in a "sexually derogatory manner," referring to her and Hogan, a supervisor who was friendly towards her, as "Ozzie and Harriet." The secretary, the ID officer, another subordinate officer, and plaintiff had heard the comment. Plaintiff called it another example of a derogatory remark made solely on the basis of gender and used to undermine her authority, embarrass her in front of subordinate personnel, and sexually harass her.
*195 At a grievance hearing on February 17, 1994, Pinches admitted to Giannone that he had made the comment. Giannone determined that it was not sexual harassment but nevertheless inappropriate, and instructed Pinches to refer to plaintiff and other officers by rank.
In early 1996, White told plaintiff he preferred that she wear skirts because she had nice legs. At a picnic in 1995, where she wore shorts, White told her that "she had nice legs for an old lady." White testified that at the time he did not think the remark was improper, but after sexual harassment training, he considered it may have been inappropriate. Plaintiff reported this comment to Giannone.
At a community policing seminar, Giannone asked for each supervisor to give an opinion on community policing. Plaintiff stated that when she stood up to give her opinion, he told her to sit down because he had already heard her views. She testified that everyone was shocked and she was embarrassed. Other officers spoke up and complained about Giannone's action.
Giannone admitted that he told plaintiff that the Department never had problems with fitting officers for uniforms until there were women on the job, and that he had referred to "stretch gun belts" and uniforms for pregnant women.

E. MCMANUS LAWSUIT
In 1992, plaintiff became aware that Mc-Manus had filed a lawsuit complaining about a hostile work environment. In May of 1995, plaintiff told the Township attorney handling the McManus case that she had been harassed, and gave examples of the locker room, men walking around naked, cartoons, jokes, pornographic movies, and Playboy magazines. She told the attorney that Pinches was harassing her and that if things did not stop, that she would file the next lawsuit.
Saage stated that he was not aware of any problems in the Department involving sexual harassment until 1992 when Mc-Manus filed a lawsuit.

F. HARASSMENT POLICIES AND TRAINING
On July 20, 1993, the Township Council adopted Resolution 283-93, which sets forth a sexual harassment policy applicable to all employees, managers, non-supervisors, elected officials, and outside contractors and requires posting on all employee bulletin boards. It provided:

SEXUAL HARASSMENT POLICY
A. Sexual harassment may involve, but is not limited to:
1. Making unwelcome sexual advances or requests for sexual favors a condition of employment.
2. Making the submission to or rejection of such conduct the basis for employment decisions affecting the employee.
3. Creating an intimidating, hostile or offensive working environment by such conduct.
4. Making unwelcome, offensive remarks or engaging in physical contact with a subordinate or fellow employee that would not have been made but for the employee's sex, or which is sexually oriented to the extent that it would not occur but for the fact of the employee's gender.
5. Harassment based solely on gender, which creates a hostile and offensive work environment.
B. Sexual harassment may take different forms. One specific form is a demand for sexual favors. Other forms of harassment include, but are not limited to:
*196 1. Verbal: sexual innuendos, suggestive comments, jokes of a sexual nature, sexual propositions or threats.
2. Non-verbal: sexually suggestive objects or pictures, graphic commentaries, suggestive or insulting sounds, leering, whistling, obscene gestures.
3. Physical: unwanted physical contact, including touching, pinching, brushing the body, pushing[.]
4. Other: non-sexual conduct such as intimidation and hostility based solely on gender.
C. Employees who believe they have been the subject of sexual harassment should immediately report the matter, so that steps can be taken to stop the harassment, in accordance with the following procedure:
1. To their supervisor unless he/she is the person being accused of sexual harassment.
2. To their Department Head if the immediate supervisor is being accused of sexual harassment.
3. To the Township Manager if the Department Head is being accused of sexual harassment.
4. To the Township Council if the Township Manager is being accused of sexual harassment.
D. If not satisfied with the response at 1 or 2 above, the employee may submit the complaint to the next higher level up to and including the Township Manager within two working days. The submission to the Manager shall be in writing and include all previous responses or additional information accumulated during the process. The Township Manager or his authorized representative must meet with the employee to clarify the information provided and shall provide a written response within ten working days of the receipt of the complaint.
The decision of the Township Manager or his authorized representative shall be the final step in the complaint procedure, but any decision rendered is subject to appeal and review by the appropriate state and federal agencies.
E. The Township will take no retaliatory measures against any employee who complains of sexual harassment and will to the maximum extent feasible, maintain the confidentiality of such complaints on a need-to-know basis. However, investigation of such complaints may require disclosure to the accused party and other witnesses in order to gather pertinent facts.
Plaintiff never saw the Township sexual harassment policy posted in the police station and first saw a copy of it in 1996.
Effective October 27, 1995, Giannone issued an order to all personnel addressing sexual harassment, as part of the Department's Policies and Procedure Manual. It provided:
Purpose: The purpose of this order is to clarify policy and identify procedures to be used regarding Sexual Harassment.
Policy: It is the policy of this department that any form of Sexual Harassment in the workplace will not be tolerated. Employees observing such conduct will be responsible to report this behavior to their supervisor.
I. General: Harassment on the basis of sex is a violation of sec. 703 of Title VII of the 1964 Civil Rights Act, as amended in 1972. The Equal Employment Opportunity Commission (EEOC), a Federal agency enforces sexual harassment guidelines. Unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature constitutes sexual harassment when (1) submission to such *197 conduct is made either explicitly or implicitly a term or condition of an individual's employment, (2) submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual, or (3) such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment.
II. The following is a listing of the types of behavior considered to be Sexual Harassment. The following examples of Sexual Harassment should not be considered all inclusive:
A. Unwanted Behavior
1. Referring to an adult women as a girl; and adult male as a boy, or to either as a hunk, doll, babe, or honey.
2. Whistling or making cat calls[.]
3. Making sexual comments about a person's body.
4. Making sexual comments or innuendoes directly or indirectly.
5. Turning work discussions into sexual topics.
6. Telling sexual jokes or stories.
7. Asking about sexual fantasies, preferences or history.
B. Verbal BehaviorIf Offensive, Uninvited, or Unwanted
1. Asking personal questions about social life or sexual life.
2. Making sexual comments about a person's clothing, anatomy, or looks.
3. Repeatedly asking out a person who is not interested.
4. Making kissing sounds, howling at [a] person or smacking lips.
5. Telling lies or spreading rumors about a person's personal sex life.
C. Non-Verbal Behavior
1. Looking a person up and down (elevator eyes)[.]
2. Staring at a person for an inordinate amount of time.
3. Blocking a person's pathway as they [sic] work.
4. Following the person.
5. Giving unwanted personal gifts.
6. Displaying sexually suggestive visuals.
7. Making facial expressions such as winking, throwing kisses, licking lips.
8. Making sexual gestures with hands or through body movements.
D. Physical Behavior
1. Giving a massage around the neck or shoulders[.]
2. Touching the person's clothing, hair or body.
3. Hanging around a person's work space.
4. Hugging, kissing, patting or stroking.
5. Touching or rubbing oneself sexually around another person.
6. Standing close or brushing up against a person.
E. Current policy which relates to Sexual Harassment.
1. All forms of pornographic materials including videotapes and magazines are not permitted within the workplace to include [sic] the glove compartments of all police vehicles.
2. The posting of all forms of cartoons, notices, and graffiti which may be construed to ridicule or demean any gender is strictly forbidden.
3. The use of television sets within the department is limited to information relevant to the police function only. This includes weather reports, news reports, and training information. The viewing of television for entertainment, i.e. movies, *198 is not permitted except in areas predesignated by the Chief of Police.
III. In determining whether alleged conduct constitutes sexual harassment, the department will look at the record as a whole and at the totality of circumstances, such as the nature of the sexual advances and the context in which the alleged incidents occurred. The determination of the legality of a particular action will be made from the facts, on a case by case basis.
IV. ENFORCEMENT AND SCOPE
1. Supervisors shall be held accountable for the enforcement and application of this Policy/Order.
2. All members of the Teaneck Police Department are required to follow this order as applicable.
3. All Policies, Orders or Procedures heretofore employed by the Department which conflict with this Order, are hereby rescinded.
Plaintiff testified that this memorandum was the basis of many jokes.
In January 1996, White asked plaintiff to review the Township policy on sexual harassment and then appointed her as sexual harassment officer for the Department. In March 1996, plaintiff attended a sexual harassment seminar. In June 1996, Giannone, all the captains, and all the lieutenants attended a sexual harassment seminar for approximately two and one-half hours. However, in 1996, training was not given to the full staff.
Giannone testified that the Department has a video on sexual harassment that was shown to everyone in the Department every year since 1996. He believed that showing the twenty-minute tape was sufficient training.

G. WHITE'S CONDUCT TOWARDS OTHER WOMEN
On March 18, 1996, Lauren Florio, plaintiff's secretary, told plaintiff that White was harassing her.[4] When plaintiff reported Florio's complaint to Giannone, he directed her to obtain a written statement from Florio and investigate the claim. Plaintiff was reprimanded for not following the chain of command and reporting Florio's claims to White, her supervisor who was the alleged harasser. In the course of her investigation, plaintiff interviewed and took witness statements from Florio, and other women staff members in the Department, Maria Torres, Becky Williams, Kathryn Donohue, Diane Trenn, and Proxy Santiago. According to plaintiff, this was the first time she was aware of White's harassment of other women in the Department in the 1980's.
Plaintiff testified as to her conversations with Becky Williams, a police dispatcher, who recounted problems she had with White in the early 1980's. Several years later when White was being transferred, Williams was so afraid to work for him that she and her husband spoke to the chief and told of this past history.
Kathryn Donohue, another police dispatcher, told plaintiff that she too had been harassed by White in the 1980's. Donohue, one of defendant's witnesses, testified that plaintiff's report was not completely accurate and the details of an incident she had with White in the Department parking lot were different from plaintiff's summary.
Plaintiff also testified that Diane Trenn told plaintiff that when she was first hired, White used to follow her around at all *199 hours of the day and night, both while he was in his police car and while he was off duty.
Plaintiff advised Giannone that she did not interview White because he was her supervisor. Giannone spoke with White who denied any intent to sexually harass Florio and claimed that much of the commotion was due to plaintiff. White admitted that on seven or eight occasions he made remarks which might have violated the Department's policy on sexual harassment and apologized to Florio. Giannone concluded White had violated the Department's sexual harassment policy and assessed White three penalty days, which would be reinstated if he was not involved in similar conduct during the subsequent eighteen months. Giannone directed White to attend sexual harassment training.

H. ADVANCEMENT/CLAIMED RETALIATION
Burke testified that while he was chief, plaintiff was a very ambitious officer, who was aggressive, did what she was told, and did a fine job. He testified as to numerous commendations that plaintiff received based on his nomination or input.
In 1987, plaintiff was promoted to sergeant. After she became sergeant, she believed that the rules were enforced differently against her than male officers. As an example, on one occasion, Joe Florio was written up by Burke and lost two days of pay for not wearing his hat. Plaintiff, as Florio's supervisor, was written up and lost one day of pay for not performing her proper duties as a sergeant and controlling her subordinates. She had never heard of such penalties for this type of violation, and never heard of a superior losing a day for this. Florio and Officer Hayes both told plaintiff that the only reason Florio was penalized was because Burke was out to get her.
Plaintiff testified that Officer Kozinski said that he had been caught by Burke without his hat and that the chief just told him to put it on. Kozinski came to plaintiff and told her to be quiet on the police radio because if Burke heard she was supervising him then he would lose a day. Blanco testified that he never heard of another supervisor losing a day for failing to reprimand someone for not wearing a hat.
Plaintiff filed a grievance and at the May 27, 1988 arbitration, Burke admitted that it was the only time he charged someone with loss of pay for failing to reprimand someone else for not wearing a hat. The arbitration award provided for the written reprimand to be reduced to an oral warning and to be expunged from plaintiff's personnel file. Thereafter, plaintiff heard Burke state to Pinches that he did not want to remove the reprimand from her file, and Pinches suggested trying to get PBA's support for another grievance.
Plaintiff testified that shortly after receiving the arbitration award in 1988, she was transferred from being a supervisor in motor patrol with four officers under her command to the crime prevention unit. That unit had a tiny office in the back of the building with nobody to supervise and no interaction with other officers. She believed that this was a demotion because she became a sergeant in charge of no officers. She told Burke she was not happy. Many officers who had been there considered it to be punishment like a demotion.
Burke testified that the crime prevention position was a plum job because it was Monday through Friday with no weekends and no midnight shifts. It was not a demotion and other officers wanted the job. Captain Paul Tiernan testified that it was *200 a desirable assignment because you are your own boss with flexible hours. Plaintiff responded that nobody was envious of her position in crime prevention.
About 1989, plaintiff began participating in the Drug Abuse Resistance Education ("DARE") program. Plaintiff testified that when she asked Burke if the Department could start such a program, he told her it was another good closet to hide her in. She interpreted this to mean that crime prevention, where she had also worked, had also been a good place to hide her. Burke testified that he assigned her as the DARE officer, that she liked the position working with children, and that it was a highly visible position and not a closet.
In 1990, the DARE program was canceled and plaintiff was reassigned to the evening shift and told to go to all the problem areas. Plaintiff testified that Pinches told her that he did not like the DARE program and that plaintiff "was only playing with the kids and that wasn't a real cop's job." He also told her that if she wanted to be a mother, she should go home, and that he transferred her to see if she could "do the job of a real cop."
In February 1991, when plaintiff was promoted to detective-sergeant in charge of the detectives, she did not receive a gold shield. She claimed that Pinches told her that she did not need a gold shield to put in her pocketbook, that she was just going to play with kids and did not need a badge to show them, and that she did not need a badge because she was just a woman going to school.
In 1991, Burke retired, Giannone became chief of police, and plaintiff was promoted to lieutenant. When she took the lieutenant examination, she scored number one on the list. She was promoted and given the midnight lieutenant position, which she called the least desirable of the lieutenant positions. Pinches assigned her to the midnight shift for one-and-a-half years, and assigned junior and less experienced police officers to her. She claimed that because she was number one on the list and had the most seniority, she should have been able to choose the lieutenant position she wanted.
She testified that Giannone told her that she advanced because she wore a short skirt to the assessment center, which comment Giannone denied. Plaintiff believed that she did not get one of the better lieutenant positions because Giannone discriminated against her.
In May 1993, plaintiff complained in writing to Giannone about Pinches removing her as the DARE training officer and not allowing her to instruct at the police academy.
In 1994, plaintiff became head of the juvenile bureau but believed that she should have become head of the detective bureau and it was discrimination that caused her not to get that position. Sholdes stated he heard Falvey refer to the juvenile bureau as the dark side. Sholdes and Falvey also heard others call it the dark side. White testified that he never heard anyone call the juvenile bureau the dark side.
Plaintiff complained that there was evidence of retaliation against her in 1996 in connection with her investigation of the claim of sexual harassment by her secretary Lauren Florio against White. According to plaintiff, Giannone instructed her to submit her report before she had an adequate opportunity to investigate the allegations, Giannone complained that she was "groping" for witnesses, and White's memoranda attacked her and accused her of bias. Plaintiff stated that on the day she handed in her report, Giannone threatened to charge her with three counts of *201 failing to follow a direct order, which he stated would ruin her civil service standing.

I. POST-LAWSUIT BEHAVIOR TOWARDS PLAINTIFF
Following filing of this case, plaintiff claims that Giannone ignored her and encouraged other officers to shun her. White stopped speaking to her and virtually all her directions were conveyed to her through her subordinates. White testified that Giannone told him to stay away from plaintiff as much as possible. He also claimed that this was the time that e-mail became very popular and that he liked to use e-mail as an efficient way of doing business.
Plaintiff testified that since she filed this lawsuit her authority has been undermined and she takes orders from her subordinate sergeants. White testified that on several occasions, when plaintiff was not in her office, he left messages with her subordinates. Plaintiff also claimed that her bureau received different treatment, rules were selectively enforced against her and not other lieutenants, and that personnel was transferred without her input as the supervising lieutenant.
Sholdes, assigned to the juvenile bureau, testified that after plaintiff filed this lawsuit, Giannone and White had little contact with the bureau. Kelter stated that White stayed away from the juvenile bureau, White stopped talking to him, and there was a curtailment of overtime for the juvenile bureau. Blanco testified that Detective Sergeant Michael Falvey, his supervisor at the time in 1997, told him a number of times to stop talking to plaintiff.
Plaintiff, Sholdes, and Kelter also testified that after this lawsuit was instituted, White changed the dress policy for the juvenile bureau but not for the regular detectives. Kelter claimed that since 1994, dark jeans were acceptable attire for the juvenile bureau during the evening shift, but after plaintiff started this lawsuit, jeans were no longer allowed. He stated that detectives in other bureaus on evening shifts were not given the same rules of dress.

J. DENIAL OF SEXUAL HARASSMENT BY DEFENDANTS
During the period from 1981 to 1991 when Burke was chief, plaintiff never filed a union grievance about sexual harassment or discrimination.
Sergeant Veronica Thorton, the Department's present sexual harassment officer, stated that she never witnessed any sexually inappropriate conduct in the ten years she has been employed by the Department. She never saw or had any complaints about pornographic movies shown in the station house, about sexually oriented cartoons in the station house, or about pornographic magazines in patrol cars or the station house.
Numerous officers testified for defendants that they never watched pornographic movies or heard of them being shown in the police station, they never saw any cartoons of a sexual nature or could not recall any, and they never noticed any problems with men taking orders from plaintiff because she was a woman or heard any comments that women were not happy with women joining the force. One officer stated that showing of pornographic movies in the police station never happened.
Keith Richter, a detective-sergeant in the juvenile bureau, testified that he never saw anything he would consider as retaliation by Giannone or retaliation against the juvenile bureau.
*202 Levine claimed that from 1996 to 1998 it was increasingly more difficult to work with plaintiff because she was telling everyone how harassed she was and how everyone was out to get her. He added that she never complained about sexual harassment and at the Wig Wam Tavern she told him that she liked it when men flirted with her.

K. PLAINTIFF'S SYMPTOMS AND DIAGNOSIS
Plaintiff testified that she used to love her job because it was challenging, exciting, and rewarding, but now she is afraid to go to work every day because something might happen. She felt isolated, ostracized, humiliated, and embarrassed. She had terrible headaches and a stiff neck, and is very short-tempered and takes it out on her family. She claimed stress-related numbness in her face and dizziness. She has been seeing a stress therapist and a psychiatrist. Her memory is not good and she has difficulty focusing, but she believed that her basic testimony was correct even if some of the dates and places might be inaccurate. She testified that she brought her emotional distress from work into her household.
Dr. Andrew Razin, a physician expert in psychology and psychiatry, diagnosed plaintiff as having an adjustment disorder with mixed reactions of at least moderate severity. She remained under his treatment from September 10, 1998, until the time of trial. He stated that problems at home, including domestic violence, were due to her illness, and that the illness was work related.
Dr. Martin Kluger, a psychologist, diagnosed plaintiff with post-traumatic stress disorder, anxiety, and depression. To the time of trial, Dr. Kluger had seen plaintiff 100 to 120 times.
Dr. Richard M. Samuels, a clinical and forensic psychologist, testified that he evaluated plaintiff on October 26, 1998. Based on a two-and-one-half-hour interview and five-and-one-half hours of testing, he concluded that she suffered from mild psychological distress. She has a personality variance, but not a disturbed personality. It is an adjustment disorder with anxious mood and depressive disorder, different from the diagnosis made by the treating doctors. However, he conceded that when he saw plaintiff, she was already medicated and under psychological and psychiatric care.

III.
The court ruled that plaintiff presented sufficient evidence to support her claim that this was a continuing violation and that the jury was entitled to consider all evidence since 1981. Defendants assert that the jury improperly heard evidence and awarded damages concerning time-barred events. They argue that because plaintiff filed her complaint on June 12, 1996, and many of her claims of alleged acts occurred prior to June 12, 1990, the statute of limitations had run and those claims should have been dismissed as a matter of law.[5] We reject defendants' position and affirm on this point.
For causes of action based on anti-discrimination laws, the courts have created a doctrine known as the continuing violation theory as an equitable exception to the statute of limitations. Bolinger v. Bell Atl., 330 N.J.Super. 300, 749 A.2d 857 (App.Div.), certif. denied, 165 N.J. 491, 758 A.2d 650 (2000). Upon fulfilling the criteria for a continuing violation, a plaintiff *203 may recover for damages incurred as a result of the entire continuing violation. Id. at 307, 749 A.2d 857.
In Wilson v. Wal-Mart Stores, 158 N.J. 263, 273, 729 A.2d 1006 (1999), in the context of a hostile work environment claim, the Court explained that when acts "`are continuous on an almost daily basis, by the same actor, of the same nature, and the conduct becomes tortious and actionable because of its continuous, cumulative, synergistic nature,' the statute of limitations period does not commence until the final act has occurred or the conduct has ceased." (Quoting Bustamento v. Tucker, 607 So.2d 532, 542 (La.1992)).
In its brief, defendants cite a number of federal cases in support of their claim that allowing a fifteen-year continuous violation claim is unprecedented. Although much of the case law for finding a continuing violation stems from federal law, the Courts of Appeal do not apply one standard to this type of claim. See Lisa S. Tsai, Continuing Confusion: The Application of the Continuing Violation Doctrine to Sexual Harassment Law, 79 Tex. L.Rev. 531, 539-54 (2000) (identifying patterns in a wide variety of inconsistent evaluative and doctrinal standards in the federal courts).
We disagree with defendants' focus on the number of years; rather, the focus should be on the pattern and frequency of the objectionable behavior and plaintiff's awareness, as a reasonable woman-police officer, of whether she had a viable claim. This is not a bright-line test; a particular court's use of the factors will vary according to the facts and procedural history of the case. Bullington v. United Air Lines, Inc., 186 F.3d 1301, 1311 n. 4 (10th Cir. 1999).
To establish a continuing violation based on a series of discriminatory acts under both state and federal law, a plaintiff must demonstrate that: (1) at least one allegedly discriminatory act occurred within the filing period and (2) the discrimination is more than the occurrence of isolated or sporadic acts of intentional discrimination and is instead a continuing pattern of discrimination. Bolinger, supra, 330 N.J.Super. at 307, 749 A.2d 857; Rush v. Scott Specialty Gases, Inc., 113 F.3d 476, 481 (3d Cir.1997).
In evaluating whether alleged incidents of discrimination constitute a continuing violation, the court should consider three factors: (1) subject matterwhether the violations constitute the same type of discrimination; (2) frequency; and (3) permanencewhether the nature of the violations should trigger an employee's awareness of the need to assert her rights and whether the consequences of the act would continue even in the absence of a continuing intent to discriminate. West v. Philadelphia Elec. Co., 45 F.3d 744, 755 (3d Cir.1995); Bolinger, supra, 330 N.J.Super. at 307, 749 A.2d 857 (referencing Bullington, supra, 186 F.3d at 1310).
In Bolinger, supra, we affirmed the judgment of the Law Division and found no continuing violation. Id. at 309, 749 A.2d 857. We explained that the plaintiff's placement on disability was a discrete and permanent event that should have placed him on notice that his rights were being violated and triggered his duty to take legal action to recoup those rights. Ibid.
In Shepherd v. Hunterdon Developmental Center, 336 N.J.Super. 395, 404, 765 A.2d 217 (App.Div.2001), the plaintiffs sued their employer and several supervisory and management employees for hostile work environment, retaliation, and negligent supervision, based on alleged unfair treatment because they had assisted two other employees in a successful racial discrimination lawsuit against the employer. We reversed the entry of summary judgment *204 in favor of defendants and remanded some of the dismissals, among other reasons, because the plaintiffs' allegations, read in a light most favorable to them, supported the theory that the defendants' violations were continuing ones, rendering their complaint timely. Ibid.
In addressing the hostile work environment claim, we stated:
To determine whether alleged violations are continuing, we must consider the subject matter of the violations (i.e., whether they are of the same type), their frequency and their permanence. West v. Philadelphia Elec., supra, 45 F.3d at 755 n. 9; Bolinger v. Bell Atlantic, supra, 330 N.J.Super. at 307, 749 A.2d 857. It is recognized that hostile work environment claims often "straddle both sides of an artificial statutory cut-off date," West v. Philadelphia Elec., supra, 45 F.3d at 755 (citation omitted), and that to establish these claims, evidence is often relied on concerning events occurring long before the relevant filing periods. Ibid. The analysis should concentrate not on individual incidents, but on the overall scenario and the work atmosphere as a whole. Id. at 756.

[Shepherd, supra, 336 N.J.Super. at 412-13, 765 A.2d 217.]
We also stated:
The very essence of a hostile work environment claim is its continuing nature. Rarely will just one act of harassment alert an employee to a potential lawsuit. It is only when the same type of conduct continues over and over again, "on an almost daily basis," for a prolonged period of time, that the employee will realize that he or she has a cause of action. That was the very situation that confronted the plaintiffs here.
[Id. at 414, 765 A.2d 217.]
Defendants contend that plaintiff did not assert a viable continuing violation because: (1) she linked together different types of acts by different persons with different subject matters; (2) the harassment that allegedly occurred in the late 1980's consisted of isolated events and provided no linkage to the events in the 1990's; and (3) although she believed she was sexually harassed throughout her employment she sat on her rights and opted not to sue until 1996.
We are not persuaded by defendants' arguments. Plaintiff was subjected to a continuing escalating pattern of gender-based harassment by multiple individuals in the Department. The subject matter, sexually explicit cartoons or photographs, suggestions of sexual acts, or sexually harassing behavior by other officers, all constituted sexual harassment. See Bolinger, supra, 330 N.J.Super. at 307, 749 A.2d 857 (quoting Bullington, supra, 186 F.3d at 1310) (holding that the subject-matter prong relates to "whether the violations constitute the same type of discrimination.").
In West, supra, 45 F.3d at 756-57, the Third Circuit rejected the trial judge's requirement that harassment must involve the same actor or the same form of conduct. The court explained:
The "totality" approach cannot support the "same actor" or "same form of discrimination" requirements imposed at trial here. Because a hostile work environment claim is a single cause of action, rather than a sum of discrete claims, each to be judged independently, the focus is the work atmosphere as a whole. If an employer knowingly (actually or constructively) permits a hostile work environment to exist, it is of no import that the collection of incidents comprising the claim were committed by a variety of individuals. Rather, by implicitly *205 condoning harassing behavior, the employer may facilitate its spread by a greater number of harassing employees.
[Id. at 756 (footnote omitted).]
Moreover, the pattern of behavior in the subject case did not cease in the 1980's but continued into the 1990's without any periods of respite. Blanco remembered sexual cartoons from 1983 to 1990. Either in 1987 or 1989, plaintiff was locked out of the juvenile bureau while officers watched movies, and in 1991, officers watched pornographic movies in the station house. Plaintiff found notes with derogatory references to female genitalia in her mailbox up through 1992.
To force plaintiff to file a suit at the time defendants contend was necessary, such as after her assignment to the men's locker room or after her 1988 transfer to the crime prevention unit which she categorized as a demotion, would have been premature because there is no indication that plaintiff knew or should have known that she had a viable hostile work environment claim at that time. These were not discrete events, but rather ones in a long pattern of discriminatory conduct. In addition, not only did defendants fail to have a sexual harassment policy in place at that time, but the whole area of law was rapidly changing. Looking at the realities of the case, the record shows that plaintiff desired to fit into what was originally an all-male paramilitary environment. Plaintiff continually rose through the ranks and had to balance her advancement possibilities and her desire to fit in with bringing a suit. Because she was the first female police officer in the Department, she expected certain unfairness so she should not be required to have known that the level of harassment she experienced constituted an actionable claim as of 1985, 1987, or 1988.
Even if plaintiff knew about her claim in 1992 or 1993 when she told two Township attorneys about cartoons, Playboy magazines, pornographic movies, the locker room, and improper treatment from Pinches or when she complained to Giannone and threatened to file a complaint with the Equal Employment Opportunity Commission, they do not defeat her claim of a continuing violation. Even if plaintiff were aware in 1992 that she was being subjected to a hostile work environment, she had until 1998 to file a complaint, which she did.

IV.
Defendants assert that five items plaintiff found in her mailbox over a thirteen-year period (the motel key, pair of panties, two "c-t" notes, and the cartoon showing her and Hogan having intercourse) should not have been admitted into evidence because they were graphic and inflammatory, and because plaintiff did not complain about the items to management at the time they were placed in her mailbox and management was not otherwise aware of them.
The trial judge correctly ruled that the "cartoons and ... individual incidents reported or otherwise, ... shows the actual undercurrent of the police force and the attitudes of the police officers, which, ultimately, management has to be responsible for, and if management is entirely unaware of it, one has to wonder how well management is doing their job." In his charge to the jury, the trial judge stated that defendants could not be liable for harassment that they did not know about and properly instructed on the theories where liability could be imposed on the Township and the Department for any emotional distress plaintiff suffered, including, where "upper management employees knew or should have known of the harassment of her, and failed to take effective, remedial measures to stop it." See, e.g., Lehmann v. Toys `R' Us, Inc., 132 N.J. 587, 623, 626 A.2d 445 *206 (1993) (addressing when employers are liable for their supervisors' actions).
In Kunin v. Sears Roebuck & Co., 175 F.3d 289, 294-95 (3d Cir.), cert. denied, 528 U.S. 964, 120 S.Ct. 398, 145 L.Ed.2d 310 (1999), the court discussed two types of constructive notice for sexual harassment claims. The first kind occurs "where an employee provides management level personnel with enough information to raise a probability of sexual harassment in the mind of a reasonable employer...." Id. at 294. The second kind occurs "where the harassment is so pervasive and open that a reasonable employer would have had to be aware of it." Ibid.
These items were properly admitted because whether defendants had notice or constructive notice was a question that was proper for the jury to decide. As plaintiff correctly asserts, because the mailboxes were actually open slots, the items were visible, and any officer could see the sexually-oriented items placed in the slots. Plaintiff testified that she told Giannone about one note left in her mailbox in 1987. Blanco stated that he saw the motel key and the panties in the mailbox. Thus, the jury could infer that management should have been aware of these items.

V.
We discern no abuse of discretion in the trial judge's evidentiary rulings admitting testimony of White's alleged harassment of other women in the Department and evidence of McManus' lawsuit, and precluding defendants from introducing evidence concerning a long-term affair plaintiff allegedly had with Hogan and plaintiff's alleged failure to turn over one pornographic magazine. We conclude that defendants' claims regarding these issues are without sufficient merit to warrant extensive discussion. R. 2:11-3(e)(1)(A) & (E). We add the following comments.
We reject defendants' argument that the trial judge erred in admitting evidence of White allegedly following and sexually harassing other women in the 1980's since plaintiff did not witness this alleged harassment and was not aware of it when it occurred. To support his conclusion that the admission of this evidence was proper, the trial judge properly relied on the reasoning set forth in Hurley v. Atlantic City Police Department, 174 F.3d 95 (3d Cir.1999), cert. denied, 528 U.S. 1074, 120 S.Ct. 786, 145 L.Ed.2d 663 (2000), in which the Third Circuit held that "[e]vidence of other acts of harassment is extremely probative as to whether the harassment was sexually discriminatory and whether the ... [police department] knew or should have known that sexual harassment was occurring despite the formal existence of an anti-harassment policy." Neither of these two questions depended on whether the plaintiff had knowledge of the incidents. Ibid. The evidence was helpful for the jury to interpret otherwise ambiguous acts and to determine the employer's liability. Ibid. The challenged evidence created a basis for an inference that the plaintiff was targeted for abuse because she was a woman. Ibid.
Here, the trial judge's ruling was consistent with Hurley, supra, to show defendants' motives, attitudes, and intentions. It is also relevant to show when plaintiff became aware of such evidence to establish when she should have brought her complaint. Although she did not witness the harassment, as sexual harassment officer she became aware of these incidents, and it helped form her decision to bring her claims.

*207 VI.

The trial judge did not err in affirming the jury award of $500,000 award to plaintiff for emotional distress damages due to sexual harassment. He did not abuse his discretion in deciding not to interfere with the jury's assessment of damages for plaintiff's hostile work environment claim and denying defendants' request for a remittitur, stating
In the present case the evidence, viewed most favorably to Mancini, suggests that sexual harassment was present for close to a twenty (20) year period. The emotional injuries had significant repercussions on the plaintiff's personal life. Mancini was required to seek professional treatment for her emotional distress including treatment with psychotropic medications. She remains in treatment on medication. In short, there is sufficient evidence to sustain this admittedly high award.
It does not "clearly and convincingly appear[ ] that there was a miscarriage of justice under the law." Baxter v. Fairmont Food Co., 74 N.J. 588, 596, 379 A.2d 225 (1977) (quoting R. 4:49-1(a)). Nor is this a "clear case" where the jury verdict award was excessive in view of the length of time that plaintiff was subjected to a hostile work environment and the escalatory pattern of offensive conduct. Ibid. (quoting Fritsche v. Westinghouse Elec. Corp., 55 N.J. 322, 330, 261 A.2d 657 (1970)).

VII.
Defendants' motions for summary judgment, a directed verdict, and judgment notwithstanding the verdict on plaintiff's retaliation claim on the ground that she was not subjected to an adverse employment decision were properly denied by the trial judge.
In his written opinion addressing defendants' motion for judgment notwithstanding the verdict on the retaliation claim, the trial judge reviewed the evidence and stated:
The evidence here is sufficient to satisfy the legal minimums on plaintiff's retaliation claim. The plaintiff's evidence on the retaliation claim was straightforward. Mancini alleged that she effectively had been demoted by virtue of the acts of Giannone and White after she filed her investigative report on White's alleged sexual harassment of Florio and, later, her civil Complaint. Mancini pointed to the fact that White, her immediate superior, no longer spoke with her but instead conveyed his orders to her through her subordinates. People who worked in the bureau that Mancini supervised were treated differentially with respect to their jobs and potential advancement. Giannone threatened Mancini over her investigation and made efforts to humiliate her in the wake of it. Finally, several witnesses including Mancini noted that she was shunned by management as well as the rank and file at the Teaneck Police Department.
As the judge recognized, citing Wanamaker v. Columbian Rope Co., 108 F.3d 462, 466 (2d Cir.1997), "`[b]ecause there are no bright-line rules, courts must pore over each case to determine whether the challenged employment action reaches the level of `adverse'.'" He properly looked for guidance to federal law dealing with Title VII and Civil Rights legislation to determine what constituted an adverse employment decision in the context of a LAD retaliation claim, considering factors such as the employee's loss of status, a clouding of job responsibilities, diminution in authority, disadvantageous transfers or assignments, and toleration of harassment *208 by other employees. See, e.g., Wideman v. Wal-Mart Stores, Inc., 141 F.3d 1453, 1456 (11th Cir.1998); Wyatt v. City of Boston, 35 F.3d 13, 15-16 (1st Cir.1994); Collins v. State of Illinois, 830 F.2d 692, 703-04 (7th Cir.1987). Moreover, we acknowledged in Shepherd, supra, 336 N.J.Super. at 419-20, 765 A.2d 217, that assignment to different or less desirable tasks can be sufficient to constitute an adverse employment action and establish a prima facie case of retaliation.
There was ample, credible evidence in the record of management ignoring and seeking to humiliate plaintiff and encouraging, by both their behavior and inaction, the rank and file officers to treat plaintiff in the same demeaning manner. This conduct, coupled with conveying orders through plaintiff's subordinates, treating her bureau and officers in her bureau differently, and giving her arguably less desirable assignments and shifts even though she had achieved the rank of lieutenant, when considered cumulatively, was, in essence, an "effective demotion" sufficient to constitute adverse employment action.
There was sufficient testimony and evidence to support plaintiff's allegations of retaliation and justify a jury award. There was sufficient evidence for a jury to conclude that there was sexual harassment and retaliatory conduct so severe and pervasive that a "reasonable person" in plaintiff's position could believe the conditions of her employment had changed and the workplace had become hostile. There was also sufficient competent evidence before the trial court to hold the Department liable for the harassment. See Lehmann, supra, 132 N.J. at 603-04, 626 A.2d 445.
The jury was free to accept plaintiff's version of the events and reject defendants'. The jury apparently found plaintiff more credible and accepted her argument that she was effectively demoted by White and Giannone in response to her report on Florio and to her filing of the present lawsuit. The jury answered on the verdict sheet that defendants subjected her "to an adverse employment action by effectively demoting her from her position as Commander of the Youth Bureau by substantially reducing her work responsibilities or authority." A verdict in plaintiff's favor for emotional distress damages as a result of defendants' retaliatory conduct was not against the weight of the evidence and a "miscarriage of justice under the law." R. 2:10-1.
On remittitur, the trial judge reduced the jury's emotional distress award for retaliation from $500,000 to $125,000. Considering defendants' appeal seeking to vacate or further reduce this award and plaintiff's cross-appeal to restore the $500,000 jury award on this claim, in light of the record we find no basis to interfere with the remittitur order. "[W]e cannot say that the court was wide of the mark or that the remittitur order constituted a manifest denial of justice." Fertile v. St. Michael's Med. Ctr., 169 N.J. 481, 502, 779 A.2d 1078 (2001).
The judge carefully instructed the jury that there were two distinct claims to be decided, a hostile workplace claim and a retaliation claim, and that damages were separate for each claim. The verdict sheet interrogatories delineated each cause of action and its damage elements. Thus, the judge correctly concluded that he was satisfied that there was adequate support for the liability verdict on each of these claims.
The judge then fully and carefully explained the basis for his remittitur and how he reached the remitted number:
Review of the record shows that there is no satisfactory way to segregate the plaintiff's emotional health prior to and subsequent to the retaliation. The retaliatory *209 conduct could not have occurred earlier than March of 1996. The Court, therefore[,] believes that the bulk of the damage award on the retaliation claim duplicates that of the hostile work environment claim. In permitting the recovery of $125,000, the Court gives full credit to Mancini's testimony and the expert testimony which indicates that the emotional injuries were significantly enhanced by the retaliatory acts engaged in by the Teaneck Defendants. The Court believes this remitted award is fair.
We are satisfied that the trial judge had sufficient basis to conclude that a significant portion of the retaliation claim award was encompassed in the sexual harassment award based on the time periods during which each cause of action accrued. Thus, the former claim was partially duplicative, and, therefore, excessive. We are also satisfied that the trial judge reached a "fair" remitted award, in an attempt to "tamper[ ] least with the intentions of the jurors, who by implication wanted to fully compensate the plaintiff [ ]...." Fertile, supra, 169 N.J. at 500, 779 A.2d 1078 (quoting Irene Deville Sann, Remitturs (and Additurs) in the Federal Courts: An Evaluation with Suggested Alternatives, 38 Case W. Res. L.Rev. 157, 191 (1987/88)) (other citations omitted).

VIII.
Overall, the judge did an exemplary job in his pre-trial, trial, and post-trial rulings, which we have affirmed. However, after careful analysis and consideration, "consider[ing] the evidence in the light most favorable to [plaintiff,] the prevailing party in the verdict[,]" we are compelled to reverse the trial judge's decision to vacate plaintiff's punitive damages award. Accordingly, we reinstate plaintiff's $500,000 punitive damages award.
The judge stated that at the close of the evidence that he had his doubts that the evidence, viewed mostly favorably to plaintiff, would support an award of punitive damages. However, he permitted the question to go to the jury, and stated that this decision "in large part [was] motivated by the potential for the significant loss of judicial resources as well as those of the parties should the Court's decision prove to be erroneous."
In considering defendants' post-trial motion for remittitur, the judge found that the sexual harassment here took place "over a lengthy period but much of it can be characterized as low grade." He found:
Much of the blame which is attributable to the Township of Teaneck and the Teaneck Police Department is focused on their failure to intervene and stop the low grade harassment which the jury apparently found to be continuous. The municipality and Teaneck Police Department adopted policies reflecting a lack of tolerance for harassment in 1993 and 1995 respectively and both made some efforts to acquaint their employees with those policies. The Teaneck Police Department, according to the undisputed evidence, has the most female police officers as a percentage of its police force in Bergen County. Several of those police officers testified and indicated that they did not witness a hostile work environment for women. And, as already noted, the retaliatory activity to which Mancini was subjected was not especially egregious.
The judgment of the initial factfinder is entitled to considerable respect. Baxter, supra, 74 N.J. at 597, 379 A.2d 225. A trial judge who is presented with such a motion may not "substitute his judgment for that of the jury merely because he would have reached the opposite conclusion; [the judge] ... is not a thirteenth and decisive juror." Dolson v. *210 Anastasia, 55 N.J. 2, 6, 258 A.2d 706 (1969). "`The object is to correct clear error or mistake by the jury. It is only upon the predicate of a determination that there has been a manifest miscarriage of justice, that corrective judicial action is warranted.'" Lockley v. Turner, 344 N.J.Super. 1, 13, 779 A.2d 1092 (App. Div.2001) (quoting Baxter, supra, 74 N.J. at 598, 379 A.2d 225).
Two prerequisites must be met for an award of punitive damages in a discrimination suit under LAD: "(1) actual participation in or willful indifference to the wrongful conduct on the part of upper management and (2) proof that the offending conduct [is] `especially egregious.'" Baker v. National State Bank, 161 N.J. 220, 223, 736 A.2d 462 (1999) (quoting Rendine v. Pantzer, 141 N.J. 292, 314, 661 A.2d 1202 (1995); Lehmann, supra, 132 N.J. at 624-25, 626 A.2d 445).
An award of punitive damages by a jury serves a twofold purpose: first to punish egregious misconduct, and second, to deter the offender, and others, from repeating it. Nappe v. Anschelewitz, Barr, Ansell & Bonello, 97 N.J. 37, 48-49, 477 A.2d 1224 (1984); Hurley, supra, 933 F.Supp. at 425.
In determining whether there is sufficient support for plaintiff's punitive damage claim, the trier of fact must use a totality of the circumstances analysis, rather than analyzing each of the plaintiff's allegations in isolation. West, supra, 45 F.3d at 756. After hearing extensive testimony by numerous witnesses over the thirteen-day trial, and being properly instructed by the court, the jury found, in a 7-1 verdict, that "plaintiff proved by clear and convincing evidence," that an award of punitive damages against the Township and Department was appropriate and set the amount at $500,000. The jury made a determination that the conduct that plaintiff was subjected to was so pervasive and so severe that punishment of these defendants and the deterrent effect that it would have was appropriate. The jury verdict was in direct response to the evidence presented in light of credibility assessments. It is clear to us that the jury drew the inescapable conclusion that despite specific and repeated notice by plaintiff and other women in the department of sexually offensive comments and inappropriate gestures by subordinates and superiors alike; and the shocking pervasiveness of sexually-explicit cartoons, pornographic magazines, and videos in the Department, the Township and Police Department "just did not get it" and did nothing to curtail or prevent sexual harassment from occurring. The attacks upon plaintiff's dignity are not of lesser import because obscenities were commonly heard in the Department and some of the inappropriate behavior was common to a male-dominated police department. See Lockley, supra, 344 N.J.Super. at 15, 779 A.2d 1092. The record is replete with evidence of a continuing, escalating pattern of gender-based harassment and retaliatory conduct that management both participated in and encouraged by indifference. Plaintiff knew that she would encounter some difficulties as the first woman police officer in the Township and dealt with them as best she could. It is inexcusable, however, that a qualified law enforcement officer who rose to the rank of lieutenant by scoring number one on an objective examination, was forced to endure such egregious behavior for close to twenty years. The cumulative impact of such conduct cannot be considered "low grade."
Affirmed, except as to the $500,000 punitive damage award in favor of plaintiff, which is reinstated.
NOTES
[1] Fictitiously-named defendants have been eliminated from the caption.
[2] The court also granted defendants' summary judgment motion on all of Florio's claims except for her hostile work environment claim. Florio settled her remaining claim with defendants prior to trial.
[3] Vulgar expression for female genitalia.
[4] We will not detail Lauren Florio's claims except as they are relevant to plaintiff's appeal.
[5] Both parties agree that the operative facts predate Montells v. Haynes, 133 N.J. 282, 627 A.2d 654 (1993), so the six-year statute of limitations applies.